[Crim. No. 3548.   Second Dist., Div. One.   Mar. 19, 1942.]

THE PEOPLE, Respondent, v. HAROLD W. ROBERTS, Appellant.

Willard W. Burgess for Appellant.

Earl Warren, Attorney General, and R. S. McLaughlin, Deputy Attorney General, for Respondent.

WHITE, J.—In an information filed by the District Attorney of Los Angeles County, defendant was charged in count one thereof with a violation of section 288 of the Penal Code and in count two with a violation of subdivision 1 of section 261 of the same code. Following the entry of not guilty pleas to each count of the information, defendant was tried before a jury, which returned a verdict finding him guilty on both counts and fixing the punishment under count two as imprisonment in the county jail. Following the denial of his motion for a new trial, defendant was sentenced to the state prison for the offense charged in count one and to the county jail for that alleged in count two. From both the judgment of conviction and the order denying his motion for a new trial defendant prosecutes this appeal.

Appellant concedes that the evidence, if believed, was sufficient to show that the offenses charged were in fact committed, but argues that the identification of appellant as the perpetrator thereof was insufficient. In view of appellant's concession aforesaid, it becomes unnecessary to detail the evidence, except so far as the same is necessary to show what if any testimony was given upon which the jury could predicate a verdict against the defendant.

There is in the record evidence that on the late afternoon of July 30, 1941, about 5:30 o'clock, the complainant in count one, a girl nine years of age, was walking on the north side of Calaveras Street, in Altadena, in Los Angeles County. She was with her brother, aged five years, who was riding his tricycle. As they approached the intersection of El Molino and Calaveras Streets, the girl saw defendant driving west in his car; he drove past her and her brother, turned his car around at the intersection of Catherine and Calaveras Streets, and brought the same to a stop alongside the complainant and her brother. Defendant, who was alone in the car, told the children that he had lost his pocketbook on the school grounds and asked them to go with him in an effort to find it. Complainant told him that she would rather go home and ask her mother, but by this time defendant had gotten out of his car; he took hold of the complainant by the arm and told her he would not let her go home. She then told her brother to return home, but he refused. According to the testimony, the defendant then took the two children behind his car, across the street, up the lawn of the school, behind a deodar tree, to the steps leading to the school, and went through the corridor between the wall and the fence. At this point defendant told the complainant's brother to go up to the tennis court, which was in back of the playground, and look for the lost purse. The little boy demurred, but when defendant gave him a dime he acquiesced, and went toward the tennis court. Defendant then took the girl to another corridor, with high walls on each side, near some steps. It was there on the steps that the acts of perversion alleged in count one took place. During the commission of the offense the defendant told the girl that he would not hurt her, because he had a little girl of his own. About that time complainant's brother returned, and defendant pushed the girl down the stairs and slapped her in the face, making a mark under her left eye. She started to scream, whereupon defendant told her to desist or he would kill her; nevertheless she continued to scream. Finally he gave her a quarter, but notwithstanding she continued to scream louder than ever. Thereupon defendant ran in an easterly direction to the fence around the school yard. By that time the complainant had her brother by the hand and together they ran down the corridor and steps to the lawn in front of the school, where they met Mrs. Carrie

G. Christie and Mr. Charles L. Walters. Accompanied by Mrs. Christie, the complainant went across the street to the automobile out of which defendant had come when he accosted the children. Each of them noted the California state license number 4W592. The complaining witness also testified that she saw the defendant as he ran to his car.

On the following afternoon at the sheriff's substation in Altadena, the complainant was asked to go into a room and see if the man she had seen the day before was in there. At that time there were five or six men in that room, including the defendant, the latter of whom had his hat on and his head down, and was reading a newspaper. The child returned, stating that the man she had seen the preceding afternoon was not in the room. Shortly thereafter she went back and looked at the man who had been reading the newspaper and identified him as her assailant.

The witness Mrs. Christie, who lived across the street from the complainant, was working in her kitchen on the afternoon in question. She saw the little girl and her brother playing along Calaveras Street. She observed a very light gray-colored club coupe drive up to the curb and stop. She saw a man come around the back of the car holding the complainant by her left arm. She saw the man and the child cross the street on to the school grounds, where they disappeared from her view. She was 75 feet from them and could not recognize the man's features. Shortly thereafter Mrs. Christie heard screams coming from the direction of the school and caught the words "Johnnie," "Mother," and "kill." Mrs. Christie looked about for help and saw three high school students riding bicycles, and observed Mr. Walters, a neighbor, approaching in his automobile. Hailing them, she accompanied Mr. Walters toward the steps on the west side of the school. She saw the man who had previously crossed the street with the complainant running along the open corridor of the school. At that time she observed him quite plainly before he turned and ran back into the school. She then saw the complainant and her brother coming down the steps on the other side of the building toward her. She took them across the street to the car and noted the license number of the car parked at the curb, which was the heretofore-mentioned club coupe. Mrs. Christie took the children into her kitchen, where she wrote down the license number.

It was then about ten minutes before six o'clock. Looking out of her breakfast room window, Mrs. Christie saw the automobile in question going east on Calaveras Street and heard a screech of brakes as the car swerved around Mr. Walters, who was out in the middle of the street with his arms outstretched attempting to halt the automobile. Mr. Walters jumped to one side as the car swerved.

It further appears in the testimony that when Mrs. Christie hailed Mr. Walters, the latter parked his car. As he approached the school building, he saw the children coming down the steps, and also saw the figure of a man retreating through the school corridor. He gave pursuit, but could not overtake him. When he returned to the front of the school he saw a man running to a light-colored two-door car parked in front of the school. This man was about the same general build as the defendant. The man got in the car and drove east toward Mr. Walters, who was standing in the middle of the street with his arms outstretched. The car passed to the north of him, almost striking Mr. Walters' parked automobile. As this car passed him, Mr. Walters turned and read the number on the rear of the car. It was California 1941 state license number 4W592.

Another witness was Betty Lou Goldwater, who was with two other high school students. Her testimony was substantially the same as the foregoing, except that she saw the man cut across the intersection from the church to the south side of Calaveras Street. She saw Mr. Walters coming down the steps and she called to him. The man turned and looked at her and then started to run toward his car. She testified that man was this defendant. She further testified that she had an opportunity to look at the defendant when his car swerved around Mr. Walters, as she was standing in the street at that time. She noticed that his hair was gray.

About six o'clock, Mrs. Belle Robison was driving south on Santa Rosa Street, approaching Alameda Street. This intersection is one block south and west of the intersection of Calaveras and El Molino. The defendant, who was driving his automobile, failed to make a boulevard stop while traveling 40 miles per hour, and struck Mrs. Robison's automobile. He proceeded down the street without stopping, but turned east on a dead-end street, and a Mr. Fay, who had heard the crash, pursued him. Mr. Fay took the license number on the car, which was 4W592. He saw defendant get out of the

car; the defendant was the only occupant thereof. Defendant at that time told Mr. Fay his name was W. Case, and inquired if the lady driving the other car was all right. Mr. Fay took the defendant back to the corner to see Mrs. Robison. The witness present on that occasion testified concerning the defendant: "He had no coat on; he had on a shirt, and I believe they were gray trousers; his shirt was just like he had been under a shower bath; and he got out all red in the face and he was terribly upset, scared or something, or whatever it was, but he was in an awful—well, in an unsettled mood. He told the ladies that it was all his fault. He just took all the blame himself and said that he would pay for everything and he wanted to go someplace and settle the matter."

At approximately 25 minutes after six, defendant telephoned his home, saying to his wife, "Don't wait for me to come home to eat. You folks go on. I will be tied up with the boys, and I will call you later in the evening." Defendant was wearing a light gray suit that day. The record also contains testimony to the effect that on the following day, when the defendant, accompanied by his attorney, called on Undersheriff Jewel of the Los Angeles County Sheriff's office, where a conversation was had, the undersheriff asked the defendant "what caused him to do this," to which defendant replied, "Captain, I have been fighting this since I was in high school."

As to count two, it appears that on a Sunday morning in August, 1940, the prosecutrix, aged 14 years, and her brother, aged 11, were walking through a park located at Washington and Raymond Streets in Pasadena, about 9:30, on their way to church. The prosecutrix saw defendant seated on a bench near the tennis courts. Returning from church, she again saw defendant sitting on the same bench. As she and her brother approached Washington Junior High School, she saw defendant standing in the driveway leading to the school. He stopped them and asked them if they had seen a gray pocketbook and if they would like to help him find it. After some protest on their part, he instructed the boy to go around the driveway. When the prosecutrix started to go with her brother, defendant insisted that she go with him, taking her by the hand and leading her through various corridors of the school. When she started to scream, he slapped her in the face several times. Since appellant does not attack the suffi-

ciency of the evidence to show that the crime charged was not in fact committed, we will not set forth the details thereof. The child started to scream again, whereupon defendant slapped her and she fell, striking her head. Finally, he knelt beside her, gave her a dollar, told her not to tell her mother, and walked down the steps and across Raymond Avenue. When the child arrived home she was hysterical, her face was red, and her clothing was badly soiled. Her mother called police, who took the child to a hospital. Upon being returned to the school grounds, she found a barrette which she had been wearing. Upon that morning a medical examination disclosed recent tears in the child's hymeneal ring, the same having been inflicted, in the opinion of the physician, within less than 24 hours. It was the opinion of the same physician that the child had had a recent act of sexual intercourse. The prosecutrix named in count two positively identified the defendant as the man who outraged her person.

Appellant first urges a reversal because of the claimed inherent improbability that he committed the offenses charged, in view of his long and prominent association with outstanding musical and civic organizations in this community, as well as the normality of his family life. In this connection, however, it should be borne in mind that although entitled to offer evidence touching upon his previous reputation for chastity and morality, traits involved in the offenses charged against him, defendant did not choose to do so, notwithstanding his long residence in Los Angeles County. The ground advanced by appellant in support of the claimed inherent improbability in the testimony of his accusers is not the true test. Before testimony can be strictured as inherently improbable or unbelievable *per se*, it must appear therefrom that something has been done that it would not seem possible could be done under the circumstances described. Neither the direct nor the circumstantial evidence which we shall later discuss, nor the inferences deducible therefrom, can be thus indicted. While the arguments here advanced as to the improbability of the testimony identifying the defendant as the perpetrator of the assaults charged afforded opportunity for a persuasive argument to the jury, we find in them nothing that would justify a reviewing court in concluding that such testimony is *per se* unbelievable and that it was therefore

the duty of the jury not only wholly to disregard it, but to accept the alibi evidence offered by the defendant, or at least find that the defendant's guilt had not been proved by the evidence to a moral certainty and beyond a reasonable doubt. As this court has often heretofore stated, reviewing judges are obviously in no position to determine the credit which should be accorded witnesses or to weigh their testimony. With undoubted recognition of this fact, and in accord with the constitutional provision, the legislature has declared that the jurors are the exclusive and final arbiters of the credibility of witnesses (Code Civ. Proc., sec. 1847), and are the judges of the effect and value of evidence addressed to them, except in those cases where it is ordained by the law that it shall be conclusive proof of the fact to which it relates. (Code Civ. Proc., sec. 2061.)

Appellant next attacks the sufficiency of the testimony identifying him as the man who committed the crimes charged. We are satisfied that the evidence touching upon the identification of the defendant was amply sufficient and that his challenge to it is without merit. In the first place, we must remember that the defendant was present near the scene of the crime charged in count one. The positive identification of his automobile demonstrates that fact. Then we have the positive identification by the prosecutrix named in each count and that of a third witness, Betty Lou Goldwater, in connection with count one. The conduct of the defendant following the automobile accident in which he figured furnished grounds for an inference that the rate of speed at which he was traveling and his disregard of a boulevard stop signal constituted an effort to flee from the scene of the criminal attack made upon the victim named in count one. The correctness of the description of defendant's automobile and his general appearance and dress also furnished circumstantial evidence of the correctness of the child's testimony identifying him as her assailant. As to count two, the complainant positively identified the defendant. She had seen him on her way to church and again when she returned, and was in his company and custody during the time he committed the assault upon her. The jury was also authorized to consider the identical *modus operandi* resorted to in the commission of both offenses, viz., the claim by the defendant to the children that he had lost a wallet or purse, coupled

with the request on both occasions that the intended victim aid him in finding it. Added to the foregoing is the fact that at the time of his arrest, when being questioned by Undersheriff Jewel, with whom the defendant had enjoyed a friendship extending over a long period of years, the latter, in answer to a question as to "what caused him to do this," replied, "Captain, I have been fighting this since I was in high school."

With reference to the claimed inconsistencies in the testimony of some of the witnesses, we might observe that it rarely happens that a case is presented on appeal in which some inconsistency in the testimony of some of the witnesses may not be discovered. Seldom does a case arise upon the circumstances of which the witnesses precisely agree in all respects, but it does not follow of necessity in such cases that some one or more of the witnesses have willfully given false testimony in relation to the matters about which they have testified. Some one or more may be mistaken or some might have observed circumstances that others did not. Therefore, as we have heretofore pointed out, the law leaves to the triers of fact the exclusive right and duty to evaluate the evidence, determine its inherent value and to award to each witness the credibility which in the judgment of the jury the witness is entitled, based upon such considerations as the bias or prejudice, the candor or lack of candor of the witness, the reasonableness of his story, his relation to or interest, if any, in the outcome of the case, or the parties thereto. It therefore follows that in the case before us the jury was authorized, if it conscientiously felt warranted in so doing, as apparently it did, to reject the testimony of the defendant and the members of his family as to where he was at the time the offenses charged were committed, and to accept as true the testimony of the witnesses who positively identified the defendant, as well as the testimony given by other witnesses, circumstantial in nature, but productive of inferences upon which corroboration of the direct testimony of certain witnesses could be predicated. Uncertainties and discrepancies in the testimony of witnesses, if any there were, the strength or weakness of the identification testimony, all were matters committed to the observation and sound consideration of the jury in the first instance and to the consideration of the trial court on a motion for a new trial. The latter has approved the conclusion reached by the jury, and

we, being unable to say as a matter of law that substantial evidence is lacking to support the conviction, cannot disturb the same. (*People* v. *Farrington*, 213 Cal. 459, 463 [2 Pac. (2d) 814].)

Appellant next complains of the action of the trial judge in his ruling upon the admissibility of evidence concerning what took place at the sheriff's substation at Altadena on the occasion of the identification of defendant by the children who were complainants against him and by Betty Lou Goldwater. In this connection appellant testified that there were 15 or 18 school children present at the time. Appellant's counsel then propounded to him this interrogatory: "Well, without calling it unusual, I ask you if you recall anything that happened as any of these—any one child may have come to the door of the room with the other group there while you and the police officer, your attorney and the two newspaper men were on the inside; what did you see any of them do?" To this question defendant answered: "Well, I saw them come in and point to the police officer sitting next to me and identify him and a big uproar of laughter went out." The foregoing referred to an identification made by a child who was not identified and who was not connected with the case and did not appear as a witness therein. Upon motion of the district attorney the answer was stricken. In so ruling the trial court was correct. The record is barren of any evidence as to who the other 15 or 18 children were, or what their connection was, if any, with the instant case. The reason for their presence at that time is unexplained. Whether the witness who identified a police officer was asked to point out a person in the room in connection with the charges made against defendant, or in connection with other or similar crimes, or in connection with any crimes, does not appear. As was cogently pointed out by the learned trial judge in ruling upon the motion to strike the aforesaid answer, "we haven't the slightest idea as to what was in the mind of that person when he went to the door, what he identified the individual for, whether he in fact made any identification, or what the meaning was of his pointing. In other words, all we have is an unknown person walking in the door of a room, pointing to a police officer, and what is left? We know nothing of the context, and the matter apparently is disconnected with the case, because the witness, so far as the record

now shows, is a witness disconnected with this case.'' Thereupon appellant's counsel said, ''Yes, your Honor, I don't know the name of any such witness.'' Had the witness who made the mistaken identification of the police officer at the substation been called as a witness at appellant's trial and there identified him, then for the purpose of impeachment such witness could have been questioned as to the erroneous identification made upon another occasion. But under the circumstances here appearing, the proffered testimony was irrelevant, immaterial and hearsay.

Appellant next suggests prejudicial error upon the part of the trial court in its refusal to give to the jury, at the request of the defendant, certain cautionary instructions in which the jury would have been admonished of the dangers with which the class of prosecutions here involved is fraught; of the ample opportunity therein for the free play of malice and private vengeance; of the fact that in such prosecutions the accused is almost defenseless. We are in accord with the expression of our Supreme Court in the case of *People* v. *Benson,* 6 Cal. 221, 223 [65 Am. Dec. 506]; but in that case the prosecution was based solely upon the testimony of the prosecutrix, unsupported by facts or circumstances corroborating it, and in itself so inherently improbable as to challenge belief by reasonable men. However, where, as here, the testimony of the prosecuting witness is amply corroborated by direct and circumstantial evidence, it is not prejudicial error to refuse such cautionary instructions. (*People* v. *Rangod,* 112 Cal. 669, 672 [44 Pac. 1071]; *People* v. *Adams,* 14 Cal. (2d) 154, 162, 164 [93 Pac. (2d) 146]; *People* v. *Stangler,* 18 Cal. (2d) 688, 693 [117 Pac. (2d) 321]; *People* v. *Corey,* 8 Cal. App. 720, 730 [97 Pac. 907]; *People* v. *Currie,* 16 Cal. App. 731, 735 [117 Pac. 941]; *People* v. *Scott,* 24 Cal. App. 440, 443 [141 Pac. 945]; *People* v. *Caldwell,* 55 Cal. App. 280, 298 [203 Pac. 440]; *People* v. *Vaughan,* 131 Cal. App. 265, 274 [21 Pac. (2d) 438]; *People* v. *Agullana,* 4 Cal. App. (2d) 34, 38 [40 Pac. (2d) 848]; *People* v. *Garrett,* 27 Cal. App. (2d) 249, 252 [81 Pac. (2d) 241].)

That a cautionary instruction is not only proper but wholesome in the interests of justice in cases where the testimony of a child prosecutrix in cases such as this is uncorroborated, is practically the unanimous holding of our courts. As was said in *People* v. *Lucas,* 16 Cal. (2d) 178, 182 [105 Pac. (2d)

102], "As pointed out in the Adams case, *supra,* ' "There is no class of prosecutions attended with so much danger, or which afford so ample an opportunity for the free play of malice and private vengeance. In such cases the accused is almost defenseless, and courts, in view of the facility with which charges of this character may be invented and maintained, have been strict in laying down the rule which should govern the jury in their finding." ' However, because of some unfortunate language in the case of *People* v. *Anthony,* 185 Cal. 152, 159 [196 Pac. 47], trial judges in some instances have felt justified, as here, in refusing such an instruction. The Anthony case is contrary to the uniform line of decision in this state to the effect that such an instruction is not improper. Moreover, the objection there voiced to such an instruction, that it contains 'statements of fact, not of law,' would appear to have spent much of its force in view of the recent amendment to section 19 of article VI of the Constitution authorizing a trial court to comment on the facts.

"We therefore expressly disapprove of the language in the Anthony case tending to suggest the propriety of refusing cautionary instructions in cases of this character. . . ."

Because the testimony of the prosecutrix in both counts of the information before us was credibly and impressively corroborated, we would not be justified in directing a reversal herein because of the refusal of the trial court to give the requested instructions of a cautionary nature. It should also be noted that the trial court admonished the jury that in deciding the case they were to be governed exclusively by the evidence and were not to be swayed by any motives of sympathy, passion or prejudice.

A reading of the rather voluminous transcript in this case impresses us that the learned trial judge was fair and just to both the prosecution and the defense. Throughout the rather long trial he was patient and kindly disposed toward all the parties and counsel for both sides. Appellant has been fairly tried and justly convicted of the offenses charged against him.

Since this cause was placed upon the calendar of this court appellant has presented an application for admission to bail pending appeal. That application was ordered submitted February 24, 1942. For the reasons herein stated, we find no abuse of discretion in the action of the trial court refusing to admit appellant to bail pending his appeal.

The application for admission to bail is denied. The judgment and the order denying defendant's motion for a new trial are, and each is, affirmed.

York, P. J., and Doran, J., concurred.