[Crim. No. 3664.   Second Dist., Div. One.   Apr. 8, 1943.]

THE PEOPLE, Respondent, v. HARRY S. FLEMING, Appellant.

Maurice A. Gleason for Appellant.

Robert W. Kenny, Attorney General, and Bayard Rhone, Deputy Attorney General, for Respondent.

WHITE, J.—In an information filed by the District Attorney of Los Angeles County defendant was accused in three counts of the crime of forcible rape while two counts charged him with kidnapping. A prior conviction of rape and robbery, for which the defendant served a term of imprisonment in the state prison, was also charged and admitted. Following not guilty pleas on all counts, trial was had before a jury resulting in the conviction of defendant upon each count of the information. From the judgments of conviction, the order denying his motion for a new trial and from the verdicts of the jury defendant prosecutes this appeal.

With reference to counts one and five wherein the defendant is charged with rape and kidnapping of the complaining witness, we find in the record evidence that between nine and ten o'clock on the night of June 28, 1942, the prosecutrix, re-

turning home alone, was just stepping upon the porch of her residence when the defendant threw his hand around her neck and placed one hand or fist against her right side and admonished her to keep walking. Turning around and looking at the defendant, the complainant asked him what was wrong to which he replied "Don't say anything, but just keep walking." In obedience to defendant's command, the prosecutrix turned and went south on Wadsworth Street while the defendant had his one hand around her neck and the other against her side. She did not see anything in his hand but felt him punching her continuously in her side. They walked to an old shack or garage about three houses from the complainant's residence where defendant opened the door and forced the complaining witness in. When they were inside defendant told her to get on a table. At that time she looked at him and inquired what was wrong with him and whether he was crazy. At about that time defendant removed his hat and threw it over her face at which time she removed it therefrom and shoved it back. Prosecutrix then observed that defendant had a knife and that he was moving it back and forth about her neck, saying to her "Just be quiet and do as I tell you." Defendant then removed a portion of her clothing and accomplished an act of sexual intercourse upon her. Following the consummation of this act, defendant related to the prosecutrix that on the night before he "Was out to Gene Searles and had taken some woman home with him and that she kept his wallet." The importance of this statement will be apparent later when we discuss the question of corroboration. About ten minutes later defendant again pushed the complainant on the table and forcibly accomplished a second act of intercourse. He then asked the complainant what she was going to do about it and when she replied to the effect that she was not going to do anything he opened the door and told her to walk out in front of him. After emerging from the shack, he instructed her to keep walking ahead of him, which she did to a point at the next street intersection where they both stood under the street light while he again interrogated her as to what she was going to do and as to whether she was going to call the police. During this interval, the prosecutrix testified, "Then I got a good look at him." After assuring the defendant that she was not going to take any action about what had occurred, he told her to walk ahead toward her house during

which course he followed her for a short space and then disappeared. She made complaint to a neighbor of what had occurred and the following afternoon reported it personally to the police department. This neighbor testified that at the time the prosecutrix came to her house, the latter seemed to be very much frightened.

On July 19, 1942, about three weeks after the alleged assault, Officer Broady, of the Los Angeles Police Department who was acquainted with the appellant, was driving west on Jefferson Boulevard when he asked the defendant if he wanted a ride, which invitation was accepted. During the course of this ride the officer inquired of defendant as to how he had been getting along and as to whether he was working, to which defendant replied that he had a job in Beverly Hills, and he then related the story to the officer of an occasion when defendant had been down to a place called Gene Searles and that while he was there he "made up" with a woman who, while he was asleep, took his wallet. This should be noted as identical with the story related by the prosecutrix as having been told to her by the defendant. Also during the ride the officer noticed that defendant had a cut about an inch and one-half or two inches long on his left hand which at that time was not bandaged with any adhesive tape.

In count two appellant was charged with forcible rape on or about July 16, 1942, and in connection therewith the prosecutrix testified that she had spent the preceding night at the home of her mother, leaving there shortly before four o'clock on the morning of the assault. As she was walking along the sidewalk and had passed a parked truck, defendant stepped out and struck her a very heavy and painful blow on the side of her head. At the time she was struck, the complainant cried out for help and the defendant uttered a vile epithet to her while he shoved her back of a truck on an adjoining parking lot and placed a handkerchief in her mouth. After pushing her approximately twenty or twenty-five feet back from the sidewalk he knocked her down and as the handkerchief came out of her mouth she "started to holler," whereupon he struck her a vicious blow and accomplished an act of sexual intercourse with her. Feigning unconsciousness, the prosecutrix lay very still after consummation of the act and defendant walked away saying "I don't know why I did this. I am sorry." After determining that the defendant was out of sight, the complainant ran to a stranger's house near

by where she was admitted and told the occupants what had occurred. They took her to the Georgia Receiving Hospital where some eight or ten stitches were required in the wound on the right side of her head. From the Receiving Hospital she was transferred to the General Hospital where she stayed from the 16th to the 29th of July by reason of the injuries received in her altercation with the defendant. The occupants of the house at which complainant sought refuge testified that at the time she awakened them she was bleeding from the head and told them she had been attacked by a man. The prosecutrix positively identified the defendant and described the color of the clothes he was wearing. She further testified that she was able to identify the defendant by reason of lights in the buildings across the street from the place of the attack.

The victim named in counts three and four, charging forcible rape and kidnapping, testified that just before midnight on July 20, 1942, she drove home in her automobile, parking it on the street near the front door. She then went to the back yard of her residence and was proceeding toward the back door at which time she heard footsteps in back of her and turning around observed a man. She positively identified defendant as this man. He addressed her saying "Pardon me, lady, this is a stick-up." He then began hitting her on the head and admonished her not to cry out, but nevertheless she did. He struck her with the butt end of a pocket-knife and also choked her with his right hand thereby causing her to stop screaming. He continued to choke her as he dragged her out to the front sidewalk and started down the street, during which time he kept telling her to keep quiet under threat of being killed. After the prosecutrix and defendant had walked some three doors from where she lived, they encountered another man. The two men turned into a garage and then blindfolded her with a handkerchief. From there, with defendant and the other man on each side of her, they walked west on 48th Street to McKinley Avenue. During this time the men held her arms down and continued choking and cursing her. She offered them her purse, which they refused, and finally arrived at a school grounds where they compelled her to mount a box and with their assistance she climbed over the fence and walked up two flights of stairs in the school building. The prosecutrix continued to plead with her assailants not to harm her and their only answers were constant

threats to kill her and continued pummeling of her with the blunt end of the knife. Over strenuous objections and resistance on the part of the prosecutrix and with the aid of his companion, the defendant removed a portion of the complainant's clothing and accomplished an act of intercourse. During the time the prosecutrix was with the defendant she remonstrated continuously against his advances and in answer to her plea that he do not molest her and thereby infect her with a venereal disease, he stated that he was a cook in Beverly Hills and in connection with that occupation was required to have a doctor's certificate as to his freedom from communicable venereal disease. This statement is important because as will appear, the defendant was subsequently apprehended in an establishment at Beverly Hills where he was employed as a cook. The prosecutrix was held prisoner for some two hours during which time the defendant ravished her three or four times. While during this time the blindfold was over the eyes of the prosecutrix, it did not entirely deprive her of her vision, and in response to inquiries made from time to time by defendant as to whether she could see, she answered in the negative and complained that the blindfold was drawn too tightly over her eyes and nose and that she couldn't breathe, as a result of which pleas defendant several times raised the blindfold and prosecutrix testified that as a matter of fact she could see under the blindfold. During the two-hour period of her captivity both of her captors smoked continuously and lighted their cigarettes with matches. The prosecutrix observed that the defendant had a piece of tape across the back of his left hand and a piece of tape on the ring finger of that hand. These are mentioned because of the testimony given by the police officer that on the day before this alleged assault when he drove the defendant in an automobile, there was a cut or injury on defendant's left hand. The complainant further testified that defendant was wearing a white shirt with blue stripes. The importance of this testimony lies in the fact that when the defendant was apprehended the next day while working at a lunch counter in Beverly Hills, he still had the tape across the back of his left hand and the tape on the ring finger of the same hand. At the time the complainant was identifying him, defendant attempted to put his left hand or both hands back of him and expressed a desire to talk to her alone. On that occasion the prosecutrix described the type of shoes the defendant had on at the time he assaulted her and

when asked if he possessed such a pair of shoes, he replied in the affirmative and produced the shoes which were identified by the victim. In answer to the officers' inquiry about his having a brown coat, the defendant denied that he had such a garment. However, upon looking through a locker the brown coat was discovered. Defendant denied that it was his so the officers reached into the pockets and found an address book. As they started to look through the book the defendant said "Oh yes, that is my coat" and jerked the address book out of the officer's hand. When questioned about a blue striped shirt which the victim testified the defendant was wearing when he assaulted her, he denied possession of any such garment. However, again the officers searched the locker and were rewarded by finding such a blue striped shirt. The defendant admitted it was his but denied that he had worn it for some time. After perpetrating the aforesaid outrages upon the prosecutrix, her captors took her out on the school grounds, assisted her over the fence and started to walk with her in front of them, admonishing her, as she was blindfolded, that they would kill her if she made a sound or tried to get away. In the middle of the block between 47th and 48 Streets on McKinley Avenue, they turned her around and took the blindfold off. She immediately rushed to her home, arriving there about 2:45 a.m., called the police who took her to the Receiving Hospital for treatment. At the trial a police department chemist testified he had received slides taken from the prosecutrix for examination at the Receiving Hospital; that he had made microscopic examination of the two slides and found each was impregnated with spermatozoa.

A neighbor of the prosecutrix testified that on the night of the assault around midnight she heard a loud scream which sounded like a woman's voice. Getting out of bed and going to the front porch, she saw a man and a woman. The man was holding the woman around the neck and she was stumbling along. Several hours later she saw the prosecutrix and the latter was crying hysterically.

A police officer testified that at about ten o'clock on the morning of July 21st he went to the aforesaid school grounds; that they were surrounded by an iron fence four feet eleven inches high. Next to the fence he found a milk box on the McKinley Avenue side, the dimensions of which box were about two feet eight inches high and approximately three

feet wide. Upon the stairs of the school building the officer found nine matches and observed a few stains that to him appeared to be semen stains.

The defendant took the witness stand in his own defense and denied having attacked any of the complaining witnesses. He testified that on the three nights in question he was at his home, 1315 West 36th Street, with his mother, his sister, niece and a Mr. Wilson. He admitted having the automobile conversation with the police officer on July 19th but denied any conversation with reference to his being at Gene Searles' place or relative to a woman stealing his wallet. The witness, Mr. Wilson, corroborated defendant's testimony as to his being home, as did defendant's sister and niece, and another acquaintance, William Morehead, who testified he was a frequent visitor to the home of defendant. However, with reference to the alibi testimony offered in behalf of defendant, we think it appropriate to quote from the remarks of the trial judge in connection therewith at the time the motion for a new trial was denied, wherein after reviewing some of the evidence, the court said "An effort was made by the defendant to establish an alibi. However, one of the witnesses fixed an alleged time by relationship to something else, by a question put by the court—I do not even want to name the witness' name—which showed that the witness, putting it in the most favorable way, was very much mistaken. Another witness had the defendant living at his home at the time when he was still in San Quentin. So the testimony was not very reliable." Whatever may be said of the testimony in support of defendant's alibi, it is at once apparent that it served only to create a conflict in the evidence and therefore was a question for the jury to determine. They resolved this conflict against the defendant and we are not authorized to disturb their conclusion when there is, as here, substantial evidence, both direct and circumstantial, to support the conclusion arrived at by the triers of fact.

As his first ground of appeal it is contended by appellant that the evidence is insufficient to support the judgments of conviction. It is not denied—indeed it admits of no denial, that the evidence conclusively shows that on three occasions within as many weeks, in approximately the same vicinity in the city of Los Angeles, three women were brutally and fiendishly assaulted and raped. In each case the technique of the perpetrator was almost identical. In two cases he forced the

victim from her home to a nearby place by threatening to kill her with a knife, and in the third case he did use the knife in severely injuring the complainant. Conceding that an appellate tribunal is without power to disturb the findings of the jury on the ground of claimed insufficiency of the evidence unless it be made to appear clearly that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the trial court, appellant nevertheless earnestly urges that the complaining witnesses did not have reasonable or adequate opportunity to observe, and therefore identify, their assailant and that their testimony in this regard challenges credulity. In this claim appellant can not be upheld. What was said by this court in *People* v. *Hightower*, 40 Cal.App.2d 102, 106 [104 P.2d 378], is particularly pertinent here. ''While the claimed inconsistencies in the testimony of the foregoing witnesses, such as the positions they were in at the time when they claimed ability to see and identify appellant, as well as other claimed weaknesses in their testimony, undoubtedly afforded grounds for a forceful argument to the jury, nevertheless they cannot avail appellant as grounds for a reversal, because the evidence identifying a defendant as the perpetrator of the crime charged need not be positive and uncontradicted. As stated in *People* v. *Farrington*, 213 Cal. 459 [2 P.2d 814] : 'The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, and the uncertainties of witnesses in giving their testimony, were matters solely for the observation and consideration of the jurors in the first instance, and for the consideration of the trial court on motion for a new trial. It has approved the finding of the jury, and on appeal this court may not disturb such finding and the action of the trial court unless we can say, as a matter of law, that there was no evidence to support the conviction'.''

It is also urged that the testimony of the complainants is incredible because they failed to make an outcry, but in the case of one of such witnesses she testified she was gagged with a handkerchief while the others were menaced with a knife and threatened with death if they cried out for help. This and other claims of inherent improbability in the testimony of the prosecutrices is answered by the rule of law which declares that where there is evidence, circumstantial or otherwise, that

a crime has been committed and that the defendant was the perpetrator thereof, the court on appeal will not attempt to determine the weight of the evidence, but will determine only whether from a consideration of the evidence it can be held that sufficient facts could not have been found existent therein by the jury to warrant the inference of guilt. It is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence; and before the verdict of the jury can be set aside on appeal on the grounds of insufficiency of the evidence, it must be made clearly to appear that upon no reasonable consideration whatever is there evidence of sufficient substantiality to support the trial court's conclusion. When the circumstances reasonably support or justify the jury's verdict, the belief or opinion of the reviewing court that those circumstances might also be reasonably reconciled with the innocence of the defendant, will not authorize or sanction interference with the determination arrived at by the jury (*People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778], and cases therein cited). In the recent case of *People* v. *Roberts,* 50 Cal.App.2d 558, 564 [123 P.2d 628], this court enunciated the rule with reference to claimed improbability of the testimony and alibi evidence, when we declared "The ground advanced by appellant in support of the claimed inherent improbability in the testimony of his accusers is not the true test. Before testimony can be strictured as inherently improbable or unbelievable *per se,* it must appear therefrom that something has been done that it would not seem possible could be done under the circumstances described. Neither the direct nor the circumstantial evidence which we shall later discuss, nor the inferences deducible therefrom, can be thus indicted. While the arguments here advanced as to the improbability of the testimony identifying the defendant as the perpetrator of the assaults charged afforded opportunity for a persuasive argument to the jury, we find in them nothing that would justify a reviewing court in concluding that such testimony is *per se* unbelievable and that it was therefore the duty of the jury not only wholly to disregard it, but to accept the alibi evidence offered by the defendant, or at least find that the defendant's guilt had not been proved by the evidence to a moral certainty and beyond a reasonable doubt. As this court has often heretofore stated, reviewing judges are obviously in no position to determine the credit which should be accorded witnesses or to weigh their testimony.

With undoubted recognition of this fact, and in accord with the constitutional provision, the Legislature has declared that the jurors are the exclusive and final arbiters of the credibility of witnesses (Code Civ. Proc., sec. 1847), and are the judges of the effect and value of evidence addressed to them, except in those cases where it is ordained by the law that it shall be conclusive proof of the fact to which it relates. (Code Civ. Proc., sec. 2061.)'' Furthermore, in the instant case the testimony of the victims of defendant's lust was amply corroborated by facts and circumstances which we have hereinbefore narrated in our epitome of the evidence offered by the prosecution. Under the facts here present and the decisions quoted herein, appellant's claim of inherent improbability in the testimony of the prosecuting witnesses must be held to be devoid of merit.

Finally, appellant urges that the court erred in its failure to give a cautionary instruction to the effect that charges such as the ones herein alleged are ''easily made and difficult to disprove'' and that the testimony of the prosecutrices ''should be considered and examined with caution.'' In *People* v. *Roberts, supra,* at page 568, this court gave expression to its entire accord with the rule that in cases like the present one, where by the very nature of the offense corroboration is ordinarily precluded and therefore not required, it is not only proper but wholesome in the interests of justice that a cautionary instruction be given to the jury. However, the rule just enunciated is predicated upon another rule of law and that is the rule made necessary for the protection of the public, and which permits a conviction in this type of cases on the uncorroborated testimony of the prosecuting witness. It further follows that in a case where the reason for the rule, viz., a conviction on the uncorroborated testimony of the prosecutrix is not present, the rule does not apply. As was said in *People* v. *Putnam,* 20 Cal.2d 885, 892 [129 P.2d 367], relied upon by appellant ''The circumstances of the case must determine whether the failure to instruct the jury constitutes prejudicial error.'' For instance, in the case of *People* v. *Lucas,* 16 Cal.2d 178 [105 P.2d 102, 130 A.L.R. 1485], a failure to give a cautionary instruction did not constitute reversible error where an examination of the record disclosed that the evidence clearly pointed to the appellant's guilt. That a judgment may be reversed because of error only when it appears from the record that it was prejudicial, caused

substantial injury and that a different result would have been probable if the error had not occurred, is firmly established in our law by a legion of authority (*People* v. *Lucas, supra*). Because the testimony of the prosecuting witnesses in all counts of the information now before us was credibly and impressively corroborated by both direct and circumstantial evidence, the action of the trial court in not giving a cautionary instruction, when none was requested, can not be held to constitute prejudicial error, nor would we be warranted or authorized to direct a reversal of the judgment. Furthermore, the jury in the instant case was instructed that the defendant was presumed to be innocent and that his guilt must be established by competent evidence and beyond a reasonable doubt, and the meaning of such a doubt was defined by the court. In addition, the jury was admonished that they were to be governed solely by the evidence introduced at the trial and the law as expounded by the court. They were cautioned against being influenced against the defendant by passion, prejudice, public opinion or public feeling. The verdicts are amply supported by the evidence which points to the appellant's guilt.

The attempted appeal from the verdicts is dismissed because no appeal lies therefrom, and for the reasons herein stated the judgments and the order denying defendant's motion for a new trial are, and each is, affirmed.

York, P. J., and Doran, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 6, 1943.