[Crim. No. 4360. In Bank. Aug. 3, 1943.]

THE PEOPLE, Respondent, v. HARRY W. DAIL et al.,
Appellants.

Paul Blackwood, Frank Sturgis, Frank Desimone and Otto Christensen for Appellants.

Earl Warren, Attorney General, Eugene M. Elson and Frank Richards, Deputies Attorney General, Buron Fitts, District Attorney, and John Barnes, Deputy District Attorney, for Respondent.

GIBSON, C. J.—In an indictment containing seven counts, the defendants were charged with offenses connected with the activities of a labor union in and about the city of Los Angeles.

Count one charged conspiracy to commit assaults by means of force likely to produce great bodily injury and to commit extortion by obtaining property of persons with their consent induced by the wrongful use of force and fear. Five other counts charged certain defendants with having assaulted persons by means of force likely to produce great bodily injury, and the remaining count charged defendants with the crime of extortion.

Defendant Burris became a witness for the State and all charges against him were dismissed. At the commencement of the trial, defendant McKnight changed his plea of not guilty to guilty to count one. The other charges against him were dismissed and he became a witness for the State. Defendants Dail and Lewis were acquitted on all counts except the first, charging conspiracy. Defendants Belanger and Copelan were acquitted on all counts except two and three, under which they were convicted of simple assault, a misdemeanor. The remaining defendants were acquitted on all counts. Dail, Lewis, Copelan and Belanger appealed from the judgments and orders denying a new trial. Dail has since died and his appeal must therefore be dismissed.

Appellants contend that the verdicts and judgments are without support in the evidence and are based on accomplice testimony which was impeached. They also contend that the court committed prejudicial error in giving and refusing instructions and in commenting on the evidence at the conclusion of the trial.

During the period involved here, rival unions representing the American Federation of Labor and the Congress of Industrial Organizations were engaged in a struggle to organize truck drivers on the Pacific Coast and bring them within their respective unions. The campaign for membership was hotly contested by the opposing groups and in many instances places of business employing members of a rival union were picketed. At this time Lewis was acting president of Local 208 of the Teamsters' Union (an affiliate of the A. F. of L.) in Los Angeles. Dail was a national officer of the union, assigned to advise and assist local unions in Southern California. As part of a program to strengthen the union and increase its membership, Local 208 employed men to work as "checkers" and "organizers" whose duties were to collect dues and obtain new members. They received their instructions from Lewis and reported back to him.

The charges in this case are related to the organizational activities of Local 208 and were based on assaults alleged to have been authorized by Lewis and committed by the defendant checkers and organizers, among whom were Belanger, Copelan, McKnight and Burris. As before stated, although five charges of assault by means of force likely to produce great bodily injury were listed in the indictment, the jury found only two instances (counts two and three) of the com-

mission of simple assault by Copelan and Belanger. The evidence relating to those two counts will be discussed later.

In support of the conspiracy charge upon which Lewis was convicted the prosecution called as witnesses the defendants McKnight and Burris and two other men, Williams and Johnson, all of whom were designated as accomplices by the trial court in its instructions. McKnight, against whom a criminal charge (not connected with union activities) was then pending in the superior court, testified that Lewis told him his duties were to try to get nonunion men to join the union and if they "got tough" to use his own judgment. He testified further that he aided in "dumping" or "beating up" several persons, and that on one occasion Lewis criticized him for not having taken part in a fight between another checker and a truck driver who had been asked to join the union. He also testified that he had seen certain other defendants, including Belanger and Copelan, engaged in fighting nonunion truck drivers and members of the C.I.O. In his testimony Lewis denied that he ever advocated or authorized the use of force and stated that he instructed the checkers and organizers working for Local 208 not to use violence at any time. He testified that the only altercation of which he had personal knowledge was the Calkins-Copelan incident (hereafter referred to) and that the only reports he received of fights were in connection with occasions when "the C.I.O. had attacked some of these defendants." Other witnesses corroborated the testimony of Lewis that he had warned members of the union against the use of violence.

McKnight, who was dismissed from the union on charges preferred by Lewis, admitted on cross-examination that he had been "mad at him since." Shortly after the indictment, McKnight was questioned, and answered as follows: "Q. So you didn't talk to . . . Lewis . . . at all about any of these fights at any time? A. No. Q. In other words, all of your fights resulted from some particular occasion at the particular time? A. That is right. . . . Q. You weren't out looking for a fight? A. That is right. . . . Q. You were not under orders to go out and beat anybody up? A. No." It was also brought out on cross-examination of McKnight that he left Los Angeles at approximately the time the other defendants were arrested. He was apprehended in Kansas City and admitted that while he was there he had sent a telegram to a Los Angeles newspaper in which he stated, ". . . Would

648

you be interested in a story that would convict Harry Dail and Dexter L. Lewis and others, and if so what price for same? Must be reimbursed for same because I will be a fugitive from justice tomorrow morning at 9:30.'' McKnight further admitted sending a postal card to Lewis in which he said, ''I am afraid you are going to be sorry for not accepting those telephone charges. . . . You have made a rat out of me. I will make just as good a rat as I did a union man.''

The accomplice Burris testified for the prosecution that on several occasions he had received orders from Lewis to ''go out and beat people up''; that in November, 1937, he made a trip to Delano in an automobile with the acquitted defendants King and O'Brien; that later that night they followed the automobile of a man who had spoken at a meeting in Delano and when they passed the other car he, Burris, threw a five-pound rock through its windshield. King and O'Brien denied that any such incident ever took place. Burris was also dismissed from the union on charges preferred by Lewis and shortly thereafter wrote letters to union members and officials which revealed a feeling of bitterness and animosity towards Lewis. There was also testimony that Burris had stated he had ''engineered the break between the Teamsters Union in Wilmington and Local 208'' and that it ''was his ambition to become head of Local 208. . . .''

The two accomplices, Williams and Johnson, testified they had received instructions from Lewis that ''there were men that had to be 'dumped' . . . men who went through picket lines, C.I.O.'s and nonunion men,'' and that they had participated in altercations and had struck persons while working as organizers for the Teamsters' Union. Lewis testified that these men were never employed by Local 208, and denied that he ever gave them instructions. It appears they had done some work for other locals and that they were frequently around Local 208.

In addition to the testimony of accomplices the prosecution introduced documentary evidence consisting of teletype messages and memoranda exchanged between Lewis and Dail with reference to the business of the union and labor conditions generally in the Los Angeles area. These messages and memoranda contained no reference to acts of violence and were apparently introduced in evidence for the purpose of showing the relationship between Dail and Lewis and Local 208. There was also introduced in evidence an expense item

filed by one of the employees covering meals for members of a "goon squad." It appears that a check was issued by Lewis covering this item. In this connection Lewis stated, and his testimony was corroborated by other witnesses, that all expense items were first submitted to the treasurer for approval and the checks were then made out by a clerk and were presented to Lewis for signature without any accompanying memoranda, and that the original expense slips and office vouchers were not attached to the checks until they were canceled and returned to the office.

The evidence on which Copelan and Belanger were convicted of simple assault is also conflicting. As to count two, the evidence shows that the prosecuting witness Calkins, a member of Local 208, had been in arrears in his dues for several months prior to October 29, 1937, and that contrary to union regulations he had been driving a truck for a company operating as a union shop. Complaint also had been made that he had attempted to compel truck drivers to patronize a cafe owned by his wife. On the day of the assault alleged in count two, Copelan, Belanger and Lewis were at the Evans Freight Lines in Los Angeles where Calkins was employed. Calkins testified that while he was talking to Lewis he was struck by Copelan, and that in the scuffle that followed Belanger joined Copelan in attacking him. Other prosecution witnesses testified to having seen Copelan and Belanger fighting or scuffling with Calkins. Copelan claimed he and Calkins had an argument about the latter being in arrears in his dues and that Calkins threatened to strike him, whereupon they exchanged blows. Belanger claimed he did not enter the affray until Calkins picked up a dating stamp and raised it above his head and that he then struck Calkins to cause him to let go of the stamp. Other defense witnesses corroborated the testimony of Copelan and Belanger. Lewis testified he had left the loading dock prior to the affray, and that when it was called to his attention he ordered Belanger to stop the fight.

As to count three, the evidence shows that on November 3, 1937, the prosecuting witness Norman Smith was seated in a truck near the loading platform of the Arrowhead Freight Lines, where he was employed. Belanger asked Smith to let him see his union card. Smith said he had none because he owned his own truck, and he invited Belanger to check the registration certificate on the steering wheel. According to

Smith, Belanger then opened the door of the truck and hit him, and he put his feet in Belanger's stomach and pushed him away and alighted from the truck. Smith says he was then attacked by Belanger and two or three men. Belanger testified that as he opened the truck door to look at the registration card on the steering wheel Smith kicked him in the stomach and knocked him down. According to Belanger, Smith then got out of the truck and was about to strike him again and he hit Smith in the eye. The accomplice Burris and another prosecution witness testified that Copelan struck Smith after the latter had been hit by Belanger. Copelan, on the other hand, denied taking any part in the affray, claiming he was upstairs in an office when it took place. Several witnesses testified that shortly after the fight Smith attempted to have Belanger arrested, claiming the latter had "hit him in the eye," but made no statement about having been struck by Copelan or anyone else.

■ As has been been shown, the evidence relating to all three counts is conflicting. The evidence as to the first count was based largely upon the testimony of accomplices who were impeached. The reviewing court is bound, however, to view the evidence in the light most favorable to the respondent, and applying this well established principle to the record in this case, we must hold that the evidence is sufficient to support the verdict. It is also true, however, that in a close case where the evidence is sharply conflicting, substantial and serious errors vital to defendant that may have resulted in a miscarriage of justice must be regarded as prejudicial and grounds for reversal. (*People* v. *Silver*, 16 Cal.2d 714, 723 [108 P.2d 4].)

■ We turn now to a consideration of the appellants' contentions that the trial court committed prejudicial error in giving instructions and in commenting on the evidence. Some of the instructions claimed to be erroneous are as follows:

(1) ". . . an agreement by persons to picket a place of business and to use in picketing large numbers of pickets for the purpose of intimidating or threatening the employers or employees in such place of business, . . . constitutes unlawful picketing, and the same is true of a boycott carried on by such means";

(2) ". . . intimidation includes persuasion by or on behalf of a combination of persons resulting in coercion of the will by mere force of numbers";

(3) ". . . even a simple request to do or not to do a thing made by one or more of a body of persons under circumstances calculated to convey a threatening intimidation, with a design to hinder or obstruct workmen, is unlawful intimidation, and is not less obnoxious than the use of physical force for the same purpose";

(4) ". . . any action having in it the element of intimidation or coercion, or abuse, physical or verbal, or of invasion of rights of privacy, when not performed under sanctions of law or those lawfully empowered to enforce the law, is unlawful; . . ."

(5) ". . . every act of speech, of gesture, or of conduct which any fairminded man may reasonably judge to be intended to convey insult, threat, or annoyance to another, or to work . . . abuse upon him, is unlawful, and any group of men pursuing by agreement such unlawful conduct when engaged in the pursuing of an act lawful in itself fall within the definition of a conspiracy by performing a lawful act in an unlawful manner."

These instructions erroneously advised the jury that all concerted activities by combinations of workmen are illegal. The rule stated therein is plainly erroneous and contrary to that announced by this court in *Shafer* v. *Registered Pharmacists Union,* 16 Cal.2d 379 [106 P.2d 403], and *McKay* v. *Retail Automobile Salesmen's Local Union No. 1067,* 16 Cal.2d 311 [106 P.2d 373]. ▮ The right to picket peacefully and truthfully is guaranteed by the Constitution as an incident of freedom of speech. (*Carlson* v. *California,* 310 U.S. 106 [60 S.Ct. 746, 84 L.Ed. 1104]; *Thornhill* v. *Alabama,* 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093]; *A. F. of L.* v. *Swing,* 312 U.S. 321, 325 [61 S.Ct. 568, 85 L.Ed. 855]; *Hotel etc. Employees' Local* v. *Wisconsin Rel. Board,* 315 U.S. 437 [62 S.Ct. 706, 86 L.Ed. 946].) ▮ It cannot be said that the instructions were unrelated to the facts developed at the trial and therefore without influence upon the jury, as urged by respondent. Count one of the indictment (under which Lewis was convicted) charged a conspiracy "to commit assaults . . . and . . . to obtain property of other persons . . . with consent of said other persons which was induced by the wrongful use of force and fear," while counts two and three (under which Copelan and Belanger were convicted) charged assaults "connected in [their] commission with Count I." Labor controversy, jurisdictional disputes and organizational activ-

652

ities of rival unions were the background and framework of the charges upon which the appellants were convicted.

The record contains many references to strikes and picketing in connection with the efforts of Local 208 to obtain new members and unionize truck drivers. The efforts were directly related to the offenses charged and the erroneous instructions may have misled the jury to conclude that appellants were guilty because they had engaged in activities wrongfully characterized therein as unlawful.

It is further urged by appellants that the court in commenting on the evidence erroneously instructed the jury on matters of law as follows: (1) that the fact that the accomplice witness McKnight pleaded guilty to one count of the indictment should not discredit his testimony; (2) that the credibility of the accomplice witnesses was to be judged by the same standard as that of other witnesses. After commenting upon the testimony of the accomplice witnesses McKnight and Burris, the court instructed the jury as follows: "And in this connection, ladies and gentlemen, the credibility of all of these witnesses is to be judged by you by the same standard as that of any other witness. The fact that the witness McKnight has entered a plea of guilty to one count of the indictment or that all charges against the witness Burris have been dismissed by the Court on motion of the District Attorney, standing alone, should not discredit these witnesses or their testimony, unless, in addition thereto, there is something about their testimony or their manner of testifying or their interest in the case, or their bias or prejudice against one or any or all of the defendants which casts suspicion upon it in your minds. In the Court's opinion the testimony of the witnesses McKnight and Burris was given in a calm and dispassionate manner; their answers were well considered, and on the face of their testimony and in their demeanor upon the witness stand, there was no evidence of animosity."

■ It was clearly error for the court to instruct the jury that the fact that the witness McKnight had entered a plea of guilty to one count of the indictment (a felony) should not discredit his testimony. A witness may be impeached by showing a prior conviction of felony (Code Civ. Proc. 2051). For impeachment purposes, a plea of guilty is equivalent to proof of conviction. (*People* v. *Jacobs*, 73 Cal.App. 334, 351 [238 P. 770]; 27 Cal.Jur. 142.) The trial court in effect advised the jury that as a matter of law McKnight's

plea of guilty, which was entered in the presence of the jury, was not to be regarded as tending to impeach him, and this was an incorrect statement of the law.

A further claim of error is that the court instructed the jury that the credibility of accomplice witnesses is to be judged by the same standard as that of other witnesses. This instruction was in direct opposition to the statutory provision that the testimony of an accomplice should be viewed with distrust. (Code Civ. Proc. sec. 2061, subd. 4.) The giving of a formal instruction which stated the statutory rule did not cure the error, but instead created a serious conflict, which would normally have the effect of misleading the jury. It must be remembered that the strongest witnesses for the prosecution were the accomplices, and without their testimony the conviction could hardly have been possible. This being so, it was of the utmost importance that the jury be correctly advised as to the standards by which such testimony was to be weighed. Instead, the jury was misdirected by a clear and specific statement which in effect nullified the previous formal instruction, and no attempt was made to relate the two or explain the inconsistency. The result must inevitably have been a confusion in the jurors' minds on a matter vital to the judgment. Inconsistent instructions have frequently been held to constitute reversible error where it was impossible to tell which of the conflicting rules was followed by the jury. (See for example: *Wells* v. *Lloyd*, 21 Cal.2d 452, 457 [132 P.2d 471]; *Jolley* v. *Clemens*, 28 Cal.App.2d 55, 73 [82 P.2d 51]; *Soda* v. *Marriott*, 118 Cal.App. 635, 643 [5 P.2d 675]; 8 Cal.Jur. 633.)

The error was further emphasized here by reason of the fact that the erroneous instruction was given by the court in connection with its comments made on the testimony of the accomplices. The fact that a person is an accomplice in the commission of a crime goes to his credibility as a witness and to the weight of his testimony. In discussing the effect and weight of such testimony state and federal courts have on numerous occasions emphasized its questionable character. (*People* v. *Coffey*, 161 Cal. 433 [119 P. 901, 39 L.R.A.N.S. 704]; *People* v. *Braun*, 31 Cal.App.2d 593, 603 [88 P.2d 728]; *People* v. *Ross*, 46 Cal.App.2d 385, 397 [116 P.2d 81]; *Arnold* v. *United States* (C.C.A. 10th), 94 F.2d 499; *Craig* v. *United States* (C.C.A. 9th), 81 F.2d 816, 827; *Shields* v. *United States* (C.C.A. 3rd), 17 F.2d 66, 68.) In *Crawford* v. *United*

*States*, 212 U.S. 183, 204 [29 S.Ct. 260, 53 L.Ed. 465], the Supreme Court of the United States said with reference to the testimony of an accomplice witness that "the evidence of such a witness ought to be received with suspicion, and with the very greatest care and caution, and ought not to be passed upon by the jury under the same rules governing other and apparently credible witnesses." In 20 Am.Jur. 1087 it is said: "The facts that the testimony of accomplices is not of the most satisfactory character and that it is attended with serious infirmities are matters recognized by the decisions and are too obvious and well understood to call for exposition. Such considerations go to the credibility of the evidence, and the law requires that such testimony be closely scrutinized and accepted with caution. Indeed, it has long been the custom, both in England and in the United States, for the court not only to caution the jury as to the danger of acting upon the unsupported testimony of an accomplice, but to advise them not to convict in the absence of some corroborating evidence." In *People v. Coffey,* 161 Cal. 433 [119 P. 901, 39 L.R.A.N.S. 704] at 438, the court said that at common law it was recognized that "evidence of an accomplice, coming from a tainted source, the witness being, first, an infamous man, from his own confession of guilt, and, second, a man usually testifying in the hope of favor or the expectation of immunity, was not entitled to the same consideration as the evidence of a clean man, free from infamy. Hence, it soon became the practice of the common law judges, in the wide latitude allowed to them in the instruction of their juries, to advise the latter that the testimony of an accomplice, for the reasons indicated, was to be viewed with care, caution, and suspicion (see Code Civ. Proc., sec. 2061), that the accomplice stood before them as a witness entitled to little credit, and that the surest way of establishing his credit in their eyes was for them to note whether his testimony was corroborated in any material matter by independent evidence, and that if it were so corroborated they might put faith in all that the accomplice had said . . ." Section 2061, subdivision 4, was, in its present form, a part of the Code of Civil Procedure when it was enacted in 1872, and it was apparently an attempt to codify the common law.

The prosecution in support of the contention that the court here correctly stated that the credibility of accomplice witnesses was to be judged by the same standard as that of any

other witness relies upon *Hirshfeld* v. *Dana,* 193 Cal. 142, 160 [223 P. 451]. It was there held that subdivision 4 of section 2061 of the Code of Civil Procedure, authorizing the trial court to instruct the jury that "the testimony of an accomplice ought to be viewed with distrust . . ." is unconstitutional, because it charges the jury on matters of fact, contrary to the provisions of article VI, section 19, of the state Constitution (as it then read). (See, also, *People* v. *Northcott,* 209 Cal. 639, 653 [289 P. 634, 70 A.L.R. 806].) Several decisions of this court rendered prior to the Hirshfeld case indicate that the court was not then in accord on the question whether subdivision 4 of section 2061 was unconstitutional. (See *People* v. *Ruiz,* 144 Cal. 251 [77 P. 907]; *People* v. *Moran,* 144 Cal. 48, 63 [77 P. 777]; *People* v. *Buckley,* 143 Cal. 375 [77 P. 169]; see, also, *People* v. *Silva,* 121 Cal. 668, 670 [54 P. 146].) Chief Justice Beatty expressed the minority view in *People* v. *Ruiz, supra,* at page 255, as follows: "The legislature has the undoubted power to declare what shall not be competent evidence. In the exercise of this power it might have excluded absolutely the evidence of an accomplice or the evidence of verbal admissions of a party. Having the power to exclude altogether, it has the power to admit subject to conditions or qualifications; and clause 4 merely states the qualification subject to which this kind of testimony is admissible—the condition upon which it is allowed to go to the jury at all."

The requirement of section 1111 of the Penal Code that accomplice testimony must be corroborated is a convincing indication of the legislative intent and policy that such evidence is to be regarded as untrustworthy and not to be believed unless fortified by other evidence tending to connect a defendant with the commission of the offense charged. The power of the Legislature so to provide is not questioned and if it may thus stigmatize accomplice testimony and completely deny it credence unless corroborated, no valid reason exists why the Legislature may not declare, as it has done in subdivision 4 of section 2061, that the jury is to be instructed to view such accomplice testimony with distrust. The difference is merely one of degree. To require such an instruction on proper occasions is not to charge the jury upon matters of fact. It merely serves to state the legislative condition upon which the jury is permitted to hear that class of evidence.

The somewhat analogous situation in *People* v. *Lucas,* 16 Cal.

2d 178, 182 [105 P.2d 102], presented the question whether the defendant was entitled to a cautionary instruction in a sex case to the effect that "such a charge is easily made and difficult to disprove for which reason the testimony of the prosecuting witness should be examined with caution." This court there said, "the objection . . . to such an instruction, that it contains 'statements of fact, not of law,' would appear to have spent much of its force in view of the recent amendment to section 19 of article VI of the Constitution authorizing a trial court to comment on the facts. . . ." (See, also, *People* v. *Stangler*, 18 Cal.2d 688, 694 [117 P.2d 321]; *People* v. *Roberts*, 50 Cal. App.2d 558, 569 [123 P.2d 628].) If in a case of that type a defendant is entitled to a cautionary instruction, by analogy he is entitled to a cautionary instruction in a case involving the testimony of an accomplice, particularly when, as here, the statute directs that such an instruction be given.

 It has been suggested that the 1934 amendment to section 19 of article VI of the Constitution referred to in the Lucas case cannot validate or revive section 2061, subdivision 4, *supra*, if it were void when enacted. This does not, however, state the problem before us. We are not required to revive a statute previously declared unconstitutional for lack of constitutional authority. The real question is whether the statute was in fact void, as held in the Hirshfeld case. In our considered opinion the Hirshfeld case was based upon a misconception, and to the extent that it purported to make improper the ordinary cautionary instructions on doubtful evidence it must be overruled. The statute was never void, under our present view, and needs no "revival." The subject of the statute—a rule of procedure—involves no problems of retroactive effect which occasionally arise when a decision declaring unconstitutionality is overruled. (See e.g., Rottschaefer on Constitutional Law (1939) 37; (1937) 37 Columb. L. Rev. 1017.) The result of our present decision is that such instructions are necessary in a proper case and the failure so to instruct may be reversible error. (See, also, *People* v. *Weitzman*, 362 Ill. 11 [198 N.E. 711, 716].)

For these reasons, therefore, it was error for the trial court under the guise of comment to instruct the jury, contrary to the statute, that the credibility of accomplice witnesses "is to be judged . . . by the *same standard* as that of any other witness." An erroneous instruction on the law given to the jury by the trial court while "commenting" on the evidence

is subject to challenge on the same grounds as when included among the formal instructions. As said in *People* v. *Costello*, 21 Cal.2d 760, 765 [135 P.2d 164], an erroneous instruction upon the law cannot be deemed a justifiable comment on the evidence and credibility of a witness.

The errors in the instructions concerning the credibility of accomplice witnesses were accentuated by the comments of the trial judge concerning the testimony of accomplices McKnight and Burris. The court told the jury that in its opinion their testimony was given "in a calm and dispassionate manner"; that their answers were "well considered"; and that "on the face of their testimony and in their demeanor upon the witness stand, there was no evidence of animosity." The court made no reference to the facts that after charges were preferred by Lewis both of these witnesses were dismissed from the union, that McKnight stated under oath that he had been "mad at him since," and that there was presented in evidence a letter written by Burris containing inflammatory accusations and embittered statements against Lewis. By such one-sided comment the court drew the attention of the jury to an asserted lack of animosity toward the defendants observable in the accomplices while testifying, without mentioning the undisputed evidence that such animosity did exist. The court also in commenting upon the conflicting statements made by the accomplice McKnight, stated to the jury that ". . . the witness McKnight admits he told an entirely different story . . . in the statement he gave shortly after the indictment was returned than the story he told you from the witness stand. . . . One circumstance you are entitled to take into consideration is the fact that he testified that at the time of his (first) statement . . . he was preparing a defense to the charges, and he had no intention of pleading guilty to any of the charges, as he subsequently did." This may have served to cast doubt on the credibility of McKnight's previous statements favorable to defendants and to invest with veracity unfavorable statements made while testifying. The trial court made slight, if any, comment on the defense evidence, but it indicated that the accomplice testimony was entitled to full credence in spite of the statutory requirement that it be viewed with distrust, and despite the fact that it was thoroughly impeached. While a trial court is not necessarily required to comment on all of the evidence, nevertheless its comment should be "temperately and

fairly made. . . . Trial courts should be cautious in the exercise of this power [of comment] with a view to protecting the rights of defendants." (*People* v. *De Moss*, 4 Cal.2d 469, 477 [50 P.2d 1031].) ▮▮▮ In the present case, however, the quoted comments standing alone would not require a reversal, but when considered in connection with the accompanying erroneous instructions relative to the credibility of accomplice witnesses they serve to accentuate and emphasize the error in those instructions.

▮▮▮ The trial court also stated to the jury that "The defendants Lewis and Pitts (an acquitted defendant) have admitted to you from the witness stand their activities and control of the affairs of the organization and their consequent responsibility therefor. It is therefore not necessary for you to determine that responsibility, since it stands admitted, and should you find that the acts or activities of any of the other defendants constituted or amounted to criminal offenses, you would be warranted in finding the defendants Lewis and Pitts equally guilty of such offense or offenses." Lewis admitted only that by virtue of his position he had control of the affairs of the organization but not that he was responsible for any unauthorized conduct of its members. As before stated, Lewis testified that he had never advocated the use of violence and had admonished the men against its use and his testimony in this regard was corroborated by others. The admission of control of the organization and responsibility for its affairs does not, of course, constitute an admission that a conspiracy existed or that violence was advocated. It was therefore an incorrect statement of fact for the court to tell the jury that Lewis had admitted "responsibility therefor." ▮▮▮ Furthermore, the latter part of the quoted statement amounted to an erroneous instruction to the jury on the law to find Lewis guilty if it found *any* of the other defendants guilty on *any* of the several charges contained in the indictment. Under this improper instruction the jury was told it could find Lewis guilty on any of the several charges even though it should fail to find the existence of a conspiracy between him and any of the other defendants to commit assaults. Such erroneous instruction served to deprive Lewis of the right to have the jury consider his individual criminal responsibility. The trial court, under the guise of comment, may not properly control the verdicts by a direction either directly or *impliedly* made. (*People* v. *De Moss, supra,* p. 477; *People* v. *Ottey,* 5 Cal.2d 714, 729 [56 P.2d 193].) *People* v.

*Eudy,* 12 Cal.2d 41, 47 [82 P.2d 359], is cited by the prosecution to the effect that a trial court may express its opinion as to the guilt or innocence of a defendant. The qualification is there added, however, "provided the province of the jury is not invaded." The court here incorrectly stated the facts, erroneously declared the law and improperly invaded the province of the jury.

It thus appears that the court misdirected the jury on matters of vital importance to the defendants. We have heretofore pointed out that the evidence is in substantial conflict, and that any serious error could under these circumstances have a prejudicial effect. The record in this case consists of approximately 6,545 pages. Much of the evidence is immaterial on this appeal since it relates to three of the counts charging assaults by means of force likely to produce great bodily injury of which defendants were acquitted. Although we have made a careful examination of the entire cause we have set forth in this opinion only so much of the evidence as appears necessary to show that it was sufficient to support the judgment, but was in substantial conflict. ▮▮▮ In considering the effect of article VI, section 4½ of the Constitution, "We are not substituted for the jury. We are not to determine, as an original inquiry, the question of defendant's guilt or innocence." (*People* v. *O'Bryan,* 165 Cal. 55, 66 [130 P. 1042]; see, also, *People* v. *Roe,* 189 Cal. 548, 561 [209 P. 560].) As stated in *Tupman* v. *Haberkern,* 208 Cal. 256, 263 [280 P. 970], "Whether the error found to be present 'has resulted in a miscarriage of justice' presents a question of law on the record before the court, and the purpose of the section [4½] was to require the court to declare as matter of law whether the error has affected the substantial rights of the party complaining against it, and not for the purpose of determining the evidentiary value of the testimony or where the preponderance of the evidence lies."

The conclusion is inescapable that the errors in this case resulted in a miscarriage of justice within the meaning of article VI, section 4½ of the California Constitution.

▮▮▮ All proceedings in this cause have permanently abated as to Dail by reason of his death pending appeal and the superior court is directed to enter its order to that effect. (*People* v. *de St. Maurice,* 166. Cal. 201, 202 [135 P. 952]; *People* v. *Alexander,* 101 Cal.App. 394, 396 [281 P. 697].)

The judgments and orders denying new trials are, and each is, reversed as to appellants Lewis, Copelan and Belanger.

Carter, J., Traynor, J., and Schauer, J., concurred.

EDMONDS, J., Concurring and Dissenting.—It is conceded by all members of this court that the evidence before the jury was sufficient to support a verdict of guilty against the four appealing defendants. But, as I read the record, the character of the evidence supporting the convictions differs as to Dail and Lewis, who were found guilty of conspiracy, and as to Copelan and Belanger, who were found guilty of assault.

The evidence upon which the former were convicted was primarily the testimony of accomplices, whose veracity, because of evidence tending to impeach them, is open to serious question. I am satisfied that, without the testimony of these accomplices, the record discloses insufficient evidence to support the convictions of Lewis and Dail. Under these circumstances, the correctness of the instruction regarding the weight to be given accomplice testimony becomes a question of decisive materiality.

The trial court instructed the jury that the credibility of an accomplice is to be judged by the same standard as that of other witnesses. I agree with the conclusion of the Chief Justice that this instruction is squarely contrary to subdivision 4 of section 2061 of the Code of Civil Procedure requiring the court, on all proper occasions, to instruct the jury that "the testimony of an accomplice ought to be viewed with distrust." I also read the statute as a codification of the common-law rule, and disagree with the reasoning of *Hirshfeld* v. *Dana*, 193 Cal. 142 [223 P. 451], holding the subdivision unconstitutional. But even if the Hirshfeld case were controlling, it affords no justification for a direction by the court to the jury, as a matter of law, that the credibility of an accomplice is to be judged by the same standards as that of any other witness. The instruction was therefore prejudicially erroneous.

In the same category, so far as the conspiracy count is concerned, I place the instruction that the testimony of the accomplice McKnight was not discredited by his plea of guilty to a count in the indictment charging him with the commission of a felony. In addition, it may not be denied that the

effect of these errors was aggravated by the disproportionate attention given by the trial judge, in commenting upon the evidence, to the factors strengthening the credibility of the accomplices as compared with his total disregard of the impeaching circumstances accompanying their testimony. I also agree that the trial court unjustifiably assumed a fact not supported by the evidence in telling the jury that the defendant Lewis had admitted in his testimony his responsibility for the criminal acts of any of the other defendants.

But the evidence upon which Copelan and Belanger were convicted of simple assault is of a totally different character. That they actually committed the acts complained of may not seriously be questioned. Unlike the evidence upon which the jury found Lewis and Dail guilty, witnesses other than accomplices testified to having seen acts of violence committed by Copelan and Belanger as charged in counts two and three of the indictment. And, as indicated by the opinion of the Chief Justice, although much of the evidence related to other, as well as these, alleged acts, the jury obviously did not believe most of it for all defendants were acquitted upon the other three counts charging an assault. After the jury so carefully selected what it believed from what it disbelieved, and when its determination is amply supported by the direct testimony of witnesses other than accomplices, the erroneous instructions and comment as to the accomplice testimony did not, in my opinion, result in a miscarriage of justice so far as these two defendants are concerned. The instructions, which, in cumulative effect, erroneously advised the jury that all concerted activities by combinations of workers are illegal, could by no means have misled the jury in finding Copelan and Belanger guilty, for the error consisted in their condemnation of peaceful picketing. The nature of the charges upon which these two were convicted is obviously unconnected and incompatible with lawful picketing.

For these reasons I am convinced that the judgments and the orders denying new trials should be reversed as to Lewis and the case against him remanded for a new trial, but that, as to Copelan and Belanger, the judgment and order should be affirmed.

CURTIS, J.—I dissent. A group of eleven defendants were accused in count one of an indictment with conspiracy to commit assaults upon other persons by means of force

likely to produce great bodily injury and to obtain property from other persons, with their consent, induced by the wrongful use of force and fear. In five other counts the defendants were charged with assaulting certain named persons by means of force likely to produce great bodily injury. The remaining count accused them of the crime of extortion.

The defendants Harry Dail and Dexter Lewis were convicted on count one and acquitted on all other counts. These two defendants were sentenced to the state penitentiary for the term prescribed by law, but the sentences were suspended and probation granted for a period of ten years. As a condition of the probation eighteen months of service in the county jail was imposed. The defendants David Belanger and Dewey Copelan were convicted on counts two and three of simple assault, a misdemeanor, a lesser but included offense, and acquitted on all other counts. They were sentenced to the county jail for a term of six months on both counts, sentences to run consecutively, and probation was denied. The indictment was dismissed as to defendant Walter Hart Burris. Defendant Paul McKnight pleaded guilty to count one and the remaining counts were dismissed as to him, except count two, the disposition of which does not appear in the record. The remaining five defendants were acquitted on all counts. Defendants Dail, Lewis, Belanger and Copelan all appealed from the orders denying new trials and from the judgments. As stated in the majority opinion, Dail died after taking his appeal. The remaining defendants appealing will be hereafter referred to as the appellants.

Dail was an international representative of the International Teamsters Union, an affiliate of the American Federation of Labor. In 1935 he was ordered to make a general survey of the various road truck operations covering the State of California. In May, 1936, he was permanently assigned to the Los Angeles area. His duties were to organize, assist in organization, and to negotiate wage scales where such services were requested by the local unions. When Dail came to Los Angeles, Local Union 208 was under international receivership, a situation provided for by the International Brotherhood constitution. A receiver may be appointed at any time by the international when the general executive council of that body determines that the local officers are not acting in the best interests of the membership. When appointed, a receiver has complete control of the local. At his own request Dail was appointed receiver for Local 208, al-

though by his own admission there was no section in the constitution which covered his reason for requesting receivership. Appellant Lewis became an organizer for Local 208 in November, 1936. As such organizer his duty was to contact truck drivers who were not union members and try to persuade them to join the union. In July, 1937, Lewis was made acting president of Local 208 and was later elected to that office. Appellants Belanger and Copelan were organizers and checkers for Local 208. As such their duties were to try to get new members, to check members to determine whether their dues were paid, and to collect dues. Defendant Schultz was secretary-treasurer of Local 208. The other defendants, including McKnight and Burris, were organizers, checkers and business agents.

The appellants make numerous assignments of error, the first being that the evidence is insufficient to support the verdict. In view of the lengthy briefs running into thousands of pages, and the hundreds thereof devoted to arguments on the evidence, it should here be stated, as it has been many times before, that the appellants are not on trial before this court. They have already been tried by a fact-finding body in a trial extending over a period of three months. During that trial over 50 witnesses testified for the prosecution, over a hundred testified for the defense, and much documentary evidence was introduced. It was inevitable that there would be a great deal of conflicting evidence. It is well settled that on appeal all conflicts must be resolved against the appellant. This fundamental principle has at times been overlooked in the briefs before us in this case.

Appellant Lewis contends that there is no evidence of a general conspiracy nor is there any evidence showing his participation in any alleged conspiracy to commit assaults upon other persons by means of force likely to produce great bodily injury or to obtain property from other persons, with their consent, induced by the wrongful use of force and fear. The existence of a criminal conspiracy, like any other question of fact, is for the jury to determine. After a careful review of the record I am of the opinion that the jury might reasonably have inferred from the evidence presented that Dail and Lewis did conspire to commit the acts alleged.

It is contended that there is no direct evidence of a conspiracy or participation therein by Dail and Lewis. However,

there need be no direct evidence to establish a conspiracy, and a common design or conspiracy may be deduced from attending circumstances, viz., the nature of the acts done, the relation of the parties and the interest of the alleged conspirators. (*Johnstone* v. *Morris,* 210 Cal. 580 [292 P. 970]; *Beeman* v. *Richardson,* 185 Cal. 280 [196 P. 774]; *Revert* v. *Hesse,* 184 Cal. 295 [193 P. 943]; *People* v. *Donnolly,* 143 Cal. 394 [77 P. 177]; *People* v. *King,* 30 Cal.App.2d 185 [85 P.2d 928]; *People* v. *Yant,* 26 Cal.App.2d 725 [80 P.2d 506]; *People* v. *Fitzgerald,* 14 Cal.App.2d 180 [58 P.2d 718]; *People* v. *Collier,* 111 Cal.App. 215 [295 P. 898]; *People* v. *Schmidt,* 33 Cal.App. 426 [165 P. 555]; *People* v. *Seefeldt,* 310 Ill. 441 [141 N.E. 829]; Underhill's Criminal Evidence, sec. 771.)

The avowed purpose of Dail and Lewis was to organize the trucking industry in Southern California. It was their duty to persuade non-union truck drivers to join the union and to persuade employers to enter into closed shop contracts with the union. A combination to do these things, within legal limits, would not of course be a criminal conspiracy. But if they conspired to commit assaults on non-union truckers to force them into the union or to commit assaults for the non-payment of dues, then such action would be a criminal conspiracy as charged in the indictment. It would add nothing to this opinion to refer specifically to the numerous acts of assault. The record is replete with actual physical altercations between union organizers and non-union drivers, delinquent members, members of other unions, and drivers who owned their own trucks. Threats of personal injury and threats to and actual destruction of property run throughout the entire record. A denial of the occurrence of these physical encounters is merely an evidentiary argument contrary to the implied findings of the jury. The claim that if any organizers struck or kicked other persons, it was done only in self-defense is also an argument on the evidence, and the jury was justified in concluding otherwise. Whether the incidents were isolated and independent or all an integral part of a general conspiracy was a question of fact for the jury to determine. (*People* v. *Kauffman,* 152 Cal. 331 [92 P. 861].)

Appellant Lewis admitted that he was in charge of the activities of the organizers for Local 208. Of course, he denied that he ever gave any orders to his organizers to commit assaults on non-union members or delinquent members,

but there is ample evidence to the contrary. All of the accomplice witnesses testified that such orders were given. Attorneys' fees were authorized to be paid by Lewis for those who had been arrested for participation in assaults. Doctor and hospital bills were paid on Lewis' authorization for those who had been injured while engaged in physical altercations. Lewis signed checks in payment for expenses, including vouchers for "Meals for goon squad, 35 cents" and "Meals for beef trust, $1.13." A Mr. McCue, at the time general foreman for the Southern California Freight Lines, testified that Lewis told him that "he [Lewis] had gotten my job and that I was through, and I couldn't show up around the place anymore, otherwise he would send a goon squad and cause me some trouble." From the evidence referred to and the other evidence presented, the jury could reasonably have concluded that Lewis not only had knowledge of the activities of his organizers, but that he actually ordered the assaults to be committed. As the majority opinion conceded that the evidence is sufficient to support the verdict, a further review of the evidence will not be necessary, although the major parts of appellants' lengthy briefs are devoted to the discussion of the evidence and in an attack upon the verdict of the jury as lacking in evidentiary support.

Appellants rely on section 1110 of the Labor Code in attacking certain instructions given by the trial court in regard to strikes, picketing, and boycotts. It is urged by appellants that because of the provisions of section 1110, no act may constitute a crime if done in the interests of labor. This section declares that no agreement between two or more persons to do or not to do an act in furtherance of a trade dispute between employers and employees is criminal, if the same act committed by one person would not be punishable as a crime. The novel proposition of appellants apparently is that merely because their activities were connected with labor disputes, they are entirely free from prosecution for criminal acts. Such proposition is untenable. The appellant Lewis was neither charged with nor convicted of a conspiracy to do *any* act in furtherance of a labor dispute. He was convicted of conspiracy to commit assaults and extortion. Assaults and extortions are just as much crimes when committed by those engaged in labor activities as when committed by any other persons. There has been a great advance in the recognition

of the rights of labor since the time when a mere combination of employees to procure higher wages and shorter hours was considered a criminal conspiracy, but neither statutory law nor court decision completely absolves a man from prosecution for a criminal act simply because he is allegedly engaged in labor activities. Both this court and the United States Supreme Court have recently reiterated the warning that physical violence, threats of violence and physical intimidation in labor disputes will not be tolerated. (See *C. S. Smith Metropolitan Market Co.* v. *Lyons,* 16 Cal.2d 389 [106 P.2d 414]; *McKay* v. *Retail Automobile Salesmen's Local Union No. 1067,* 16 Cal.2d 311 [106 P.2d 373]; *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U.S. 287 [61 S.Ct. 552, 85 L.Ed 836, 132 A.L.R. 1200].) If in the alleged interest of labor, a conspiracy to commit the acts of assault and extortion is entered into, the conspirators may be prosecuted and their positions in and control of the unions involved may be taken into consideration along with other evidence in determining the existence of the conspiracy. Labor leaders are not "endowed with rights which the ordinary citizen individually does not have," as urged by the appellants.

In its instructions to the jury the trial court erroneously stated that certain acts constituted unlawful picketing and amounted to intimidation which was beyond the limits of peaceful persuasion. The criticism of these instructions in the main is that the court's definitions in some cases included acts which might be done under the constitutional guarantees by those acting in behalf of the unions during a labor dispute, if their intimidation of workers was accomplished without the use of violence. These instructions were in part directly contrary to the law in this regard as it has been recently stated in *Shafer* v. *Registered Pharmacists Union Local 1172,* 16 Cal.2d 379 [106 P.2d 403] and *McKay* v. *Retail Automobile Salesmen's Local Union No. 1067, supra.*

But in view of the evidence presented against the appellants in this case, these instructions were not prejudicially erroneous. The appellants were convicted of a conspiracy to commit assaults and to obtain property by means of force. All of the acts which the witnesses testified were committed in connection with the strike, involved bodily injury or the threat of bodily injury. The jury was not called upon to decide whether certain acts charged against the appellants

were within the limits of peaceful picketing; all of them lay far beyond the limits of what may lawfully be done in furtherance of the demands of a union in a labor dispute. The only issue to be determined by the jury's verdict, insofar at least as the count on which appellants were convicted is concerned, was whether or not appellants had conspired to commit these illegal acts. Under the circumstances the error complained of resulted in no miscarriage of justice justifying a reversal of the judgments. (Sec. 4½, art. VI, Cal. Const.)

Appellants further complain of an instruction given by the court that "Business is property within the meaning of that term as used in the Penal Code and the threat of an interruption of the business which will necessarily be attendant with loss to the business, is a threat of an injury to property." Even the most ardent supporter of labor would not controvert the truth of this statement. Indeed, that is the chief purpose of the strike and boycott, and it is difficult to understand appellants' objection to it. They seem to argue that under such an instruction the jury would only have to decide that appellants conspired to call a strike or enforce a boycott in order to adjudge them guilty of conspiracy to commit extortion. This does not follow from the instruction given. The instruction did not state that every threat of interruption of business was an unlawful injury. Furthermore, as previously stated, the court had already instructed the jury that employees might strike or threaten to strike for lawful purposes. What constituted an unlawful injury was sufficiently defined in other instructions. When the trial court gave the challenged instruction, it undoubtedly had in mind incidents such as the Red Line Transfer Company affair, in which appellant Lewis threatened to pull off all the truckers to force the company to pay unearned money to a discharged employee, and there is no doubt, in view of the other relevant instructions, that the jury accepted the challenged instruction in this light.

Appellants next attack the follow instruction: "You are instructed that one is responsible for what wrong flows directly from his corrupt intentions. If he set in motion the physical power of another, he is liable for its result. If he contemplated the result, he is answerable though it is produced in a manner he did not contemplate. If he awoke into action an indiscriminate power, he is responsible. If he gave

directions vaguely and uncautiously and the person receiving them acted according to what he might have foreseen would be the understanding, he is responsible." Inasmuch as Belanger and Copelan were actual participants in the assaults of which they were convicted, the instruction obviously was without application to them. The case of *People v. Munn,* 65 Cal. 211 [3 P. 650], is cited in opposition to the challenged instruction. That case presented a factually distinguishable situation in that the instruction there involved had to do solely with the responsibility of the defendant for his *own* acts and did not undertake, as here, to instruct the jury with respect to the responsibility of one for the acts of another when the former sets in motion the acts of the latter. Moreover, as distinguished from the instruction in the Munn case, *supra,* the instruction here challenged did not make appellants answerable for every "possible" consequence, but held them accountable only for such result as was "contemplated" and for what wrong flowed "directly" from their conduct. The instruction must be read as a whole and interpreted in the light of the offenses charged and the facts as disclosed by the evidence. Appellant Lewis was prosecuted on the theory that he, as principal, ordered the acts of assault to be perpetrated. If he ordered the organizers to "persuade" non-union men to join the union and if necessary to use forceful persuasion, it is immaterial what particular method of physical force was used, i. e., whether the organizers used fists, feet, or baseball bats. If the "physical power" was set in motion by him or if he awoke an indiscriminate power in the form of orders to the organizers, he would be responsible as charged for the direct results thereof. If, on the other hand, the organizers took it upon themselves to commit murder as an independent act, the principals would not be liable for such under the instruction given.

Appellants assert that the trial court committed error in charging the jury that it might find defendants guilty of conspiracy, if either conspiracy to commit assault or to extort were shown beyond a reasonable doubt. The attack on this instruction is utterly without merit, but is referred to as being illustrative of the type of argument that makes up a large portion of appellants' voluminous briefs. By section 182 of the Penal Code, conspiracy is a crime in itself. The gravamen of the offense is the agreeing or conspiring to-

gether to commit a crime. The allegations of one count may allege the object of the conspiracy to be the commission of any number of separate and distinct crimes. *(People* v. *Gilbert, supra; People* v. *Welch,* 89 Cal.App. 18 [264 P. 324].) Because conspiracy to commit different offenses is charged in one count, it does not follow that the prosecution must prove conspiracy to commit all of the offenses alleged. Proof of conspiracy to commit any one of the offenses alleged would be sufficient, and this is precisely what the court instructed the jury.

It is urged that error was committed by the trial court in the giving of one of its instructions in regard to the sufficiency of corroboration of the testimony of an accomplice. The method of attack used by appellants is to isolate each sentence of the instruction and then attempt to point out error in the independent sentence. Instructions should be given a reasonable, not a close and technical interpretation. (8 Cal.Jur. 631). In testing the propriety of an instruction, the charge as a whole should be considered and not isolated excerpts. *(People* v. *Besold,* 154 Cal. 363 [97 P. 871].) The particular instruction under attack, when considered as a whole, is a proper recitation of the law applicable to the necessity of corroboration. It is not in conflict with section 1111 of the Penal Code, and all of the statements made are supported by the case of *People* v. *Todd,* 9 Cal.App.2d 237 [49 P.2d 611] and the authorities cited therein.

Many other instructions are attacked by appellants. In fact, few other than those offered by appellants escape attack. Appellants also complain of the court's refusal to give certain instructions requested by them. Nothing can be gained by treating each of the remaining specifications of error separately. I am convinced that no prejudicial error has been committed by the giving or the refusal to give the instructions referred to by appellants. As in every group of instructions, some error may possibly exist but the practical administration of justice should not be defeated by a too rigid adherence to a close and technical analysis of the instructions to the jury. *(People* v. *Schmah,* 62 Cal.App. 192 [216 P. 624].)

In addition to the formal instructions, the trial court exercised the privilege given it under article VI, section 19, of the Constitution of this state, to comment on the evidence and

the credibility of witnesses. Appellants attack the whole of the comment and claim it was made up of statements of erroneous rules of law and was not judicial comment, but had the effect of an argument for the prosecution. The scope of trial court comment and the limitations thereon, under the above-cited constitutional provision, have been fully discussed in the recent cases of *People* v. *Patubo,* 9 Cal.2d 537 [71 P.2d 270, 113 A.L.R. 1303] ; *People* v. *Gosden,* 6 Cal.2d 14 [56 P.2d 211] ; *People* v *Ottey,* 5 Cal.2d 714 [56 P.2d 193] ; *People* v. *De Moss,* 4 Cal.2d 469 [50 P.2d 1031]. Further comment and citations on the subject are found in Notes 95 A.L.R. 785 and 113 A.L.R. 1308. With such full discussion already a part of the reports of this state, it is unnecessary that there be any further general comment here. In making its comment in the instant case, the court did not overstep the bounds of fair comment, nor did it assume the role of an advocate. As shown by the case of *People* v. *Patubo, supra,* a trial court may so abuse its privilege as to necessitate a reversal, but here I find no such "severe castigation and bitter denunciation" of the defendants as was present in that case. In the instant case there is no language comparable to that in the Patubo case, wherein the court stated: "If ever a man by his appearance and his manner of giving testimony has shown himself to be a willful, deliberate and outright perjurer as to material facts in a case, the defendant in this case has been it." At the outset and throughout the body of its comment the court here was careful to advise the jurors that they were the triers of the facts; that the opinion of the court was not binding upon them; and that if they arrived at conclusions different than those expressed by the court, it was not only their privilege, but their duty to disregard the conclusions of the court.

Appellants complain bitterly of a statement made by the trial court in the course of its comment that it was the jury's duty to disregard the fact that the defendants were officers or members of a labor union. Far from being error, this comment was entirely proper and was made necessary by the attitude of the appellants themselves. Throughout the trial and in the briefs before this court appellants have attempted to make the issue one of capital versus labor. Such is not the issue. Appellants were charged with the commission of certain offenses. If the evidence showed they were guilty of

those offenses, then it was proper that the jury bring in a verdict of conviction regardless of their association with a labor union. Prior to the excerpt complained of, the trial court pointed out that appellants were not being prosecuted because they were members of a labor union. It then referred to the crimes charged and followed with the statement that the jury should disregard appellants' affiliation with the union in deciding the truth or falsity of the charges contained in the indictment. In so doing no error was committed.

Appellants assert that the trial court's comment on the credibility of the testimony of the accomplice witnesses McKnight and Burris constituted an erroneous statement of law. The particular paragraph of comment attacked reads as follows: ''And in this connection, ladies and gentlemen, the credibility of all of these witnesses is to be judged by you by the same standard as that of any other witness. The fact that the witness McKnight has entered a plea of guilty to one count of the indictment or that all charges against the witness Burris have been dismissed by the court on motion of the district attorney, standing alone, should not discredit these witnesses or their testimony, unless, in addition thereto, there is something about their testimony or their manner of testifying or their interest in the case, or their bias or prejudice against one or any or all of the defendants which casts suspicion upon it in your minds.'' Considering this comment in connection with the formal instructions given, the evidence adduced at the trial, and the code sections governing accomplice testimony and testimony of witnesses generally, I am of the opinion that no error of law was committed.

In its formal instructions the court had fully advised the jury as to the necessity of corroborative evidence pointing to guilt independent of the testimony of accomplices. By these instructions the requirement of section 1111 of the Penal Code was met and the evidence shows that there was sufficient corroborative evidence. There being sufficient corroboration, it was then for the jury to determine the credibility of the accomplice witnesses and the same standard was to be used as would be applied to any other witness. The presumption that a witness speaks the truth, provided for in section 1847 of the Code of Civil Procedure, is as applicable to an accomplice witness as to any other. In the case of an

accomplice witness this presumption might of course be more easily repelled because of his position, but that fact standing alone should not discredit the testimony as a matter of law, as urged by appellants. There is no valid statutory requirement that the court instruct the jury that it should view the testimony of an accomplice with distrust. Subdivision 4 of section 2061 of the Code of Civil Procedure so provides, but that subdivision was declared unconstitutional in the case of *Hirshfeld* v. *Dana,* 193 Cal. 142 [233 P. 451]. It is true that the reenactment of that subdivision might be held valid since the 1934 amendment to section 19 of article VI, of the Constitution. of this state, permitting the court to comment on the facts and the credibility of witnesses, but such amendment cannot validate the section which was void when enacted. (See *Banaz* v. *Smith,* 133 Cal. 102 [65 P. 309]; *Newberry* v. *United States,* 256 U.S. 232 [41 S.Ct. 469, 65 L.Ed. 913].) In any case appellants can have no complaint because the court in its formal instructions did inform the jury that ''Under such conditions, the law attaches the qualification to the testimony of such witness that it must be corroborated as herein set forth and should be viewed with distrust, all independent of the question of guilt or innocence of the defendants.''

''The defendants Lewis and Pitts have admitted to you from the witness stand their activities in the management and control of the affairs of the organization and their consequent responsibility therefor. It is therefore not necessary for you to determine that responsibility, since it stands admitted, and should you find that the acts or activities of any of the other defendants constituted or amounted to criminal offenses, you would be warranted in finding the defendants Lewis and Pitts equally guilty of such offense or offenses.''

Appellants argue that the above quoted comment amounted to a directed verdict against them. I cannot agree with this contention. By this comment the court was doing no more than exercising its right to comment on the evidence. As to Lewis and Pitts, the jury was told that it *would be warranted* in finding them guilty of the acts charged. Both before and after this comment the court was careful to point out that all issues of fact were to be ultimately determined by the jury. The fact that Pitts was acquitted of all charges is evidence that the jury did not consider this comment as a di-

rected verdict. If it had been so considered, Lewis would have been convicted of assault along with Belanger and Copelan.

The majority opinion specifies numerous other portions of the comment as error, but I do not deem it necessary to give them detailed consideration. What was said in conclusion in the case of *People* v. *Ottey, supra,* is equally applicable here. It was there stated at page 730: "Although the court's comments might be said to show some lack of care in the preparation thereof, nevertheless viewing the comments as a whole in the light of the evidence and the inferences rationally to be drawn therefrom, we cannot escape the conclusion that the jury did so function as the sole and exclusive judges of the facts, the weight to be accorded the testimony, and the credibility of the witnesses, and that the verdict returned by them was their verdict exclusively. [Citing authority.] In such a case further discussion of the subject matter or the views of the courts in other jurisdictions as applied to special classes of comments indulged under the law and the facts there involved, would serve no useful purpose."

There remain to be considered appellants' numerous specifications of error of the trial court's rulings on the evidence. It is first urged that the court erred in permitting, over appellants' objections, the proceedings by which the accomplice and co-indictee McKnight changed his plea of not guilty to one of guilty on count one, to be conducted in the presence of the jury. The jury was instructed that the plea of guilty was not evidence against the other defendants, and they were specifically instructed to disregard it entirely. The authorities cited by appellants to the effect that prior confessions or pleas of guilty in subsequent trials of alleged co-conspirators or accomplices are inadmissible, are therefore not applicable. The only question is as to the alleged misconduct of the trial court in permitting the plea to be made in the presence of the jury. McKnight was one of the eleven defendants charged and all were being tried together. A day or two after the trial was under way appellants' attorney pointed out that McKnight was going to plead guilty and asked that the jury be withdrawn. In answer to this request the trial court properly pointed out that it would be a useless act because at some time throughout the trial the fact that McKnight had pleaded guilty would inevitably be disclosed to the jury. The

674

denial of the request was simply a proper exercise of the court's discretion in conducting the trial. A similar ruling was under review in the case of *Grunberg* v. *United States,* 145 F. 81 [76 C.C.A. 51]. In that case the plea of guilty of one defendant was taken in the presence of the jury panel over the objection of the other defendants. The reviewing court stated at page 86: ''We can, however, hardly regard this as prejudicial, because it is impossible to escape the belief that the fact that Burman had pleaded would come out in the course of the trial, and, also, that it would become a matter of common knowledge about the courtroom, which the entire panel would inevitably be affected by. . . . The true answer to the whole is that this was one of the ordinary incidents of a trial which is within the discretion of the court, and which we cannot review.'' (See, also, *Commonwealth* v. *Biddle,* 200 Pa. 640 [50 A. 262].)

It is contended by appellants that the court erred in receiving in evidence over objection as hearsay, People's Exhibits 31, 97 and 100, consisting of letters written by the accomplice witness Burris, and that such error was prejudicial because the letters consisted of remarks made against Lewis that were ''derogatory in nature and liberally sprinkled with epithets and vituperation.'' These exhibits were introduced on redirect examination after attempted impeachment by inference on cross-examination that Burris' motive in testifying as he did on direct examination was to curry favor with the prosecution, and that such testimony on direct examination was fabricated with this motive in mind. These exhibits tended to rebut the inferred impeachment in that they showed that Burris was of the same mind prior to his visits to the district attorney's office. When a witness is charged with testifying under the influence of some motive prompting him to make a false statement, it may be shown that he made similar statements at a time when the imputed motive did not exist. (*People* v. *Kynette,* 15 Cal.2d 731, 753 [104 P.2d 794]; *Barkly* v. *Copeland,* 74 Cal. 1 [5 Am.St.Rep. 413, 15 P. 307]; *Davis* v. *Tanner,* 88 Cal.App. 67 [262 P. 1106]; *Clark* v. *Dalziel,* 3 Cal.App. 121 [84 P. 429].) On cross-examination appellants had introduced their Exhibit Z, which referred to People's Exhibit 97. The latter then could be introduced as the balance of the whole on the same subject permitted by section 1854 of the Code of Civil Procedure. In regard to

Exhibits 31 and 100, the jury was instructed that they were not to be taken as proof of the matters stated therein, but only for the purpose of considering whether Burris fabricated evidence after getting in touch with the district attorney's office. Even assuming that the receipt in evidence of the exhibits was erroneous, appellants have no reason to complain because although they did contain statements "derogatory in nature and liberally sprinkled with epithets and vituperation," practically the identical statements were contained in Exhibit Z introduced by appellants prior to the introduction of the questioned exhibits.

Appellants next assert that error was committed in restricting the cross-examination of the accomplice witness McKnight and in permitting the cross-examination of defense witnesses beyond the scope of direct examination. To consider each point raised under these assertions would be to extend unnecessarily this dissent beyond all reasonable lengths. I am well aware of the necessity of affording the defendants' counsel the fullest scope of cross-examination of an accomplice witness (See *People* v. *Pantages,* 212 Cal. 237 [297 P. 890] ; *People* v. *Williams,* 18 Cal. 187; *People* v. *Schmitz,* 7 Cal.App. 330 [94 P. 407, 15 L.R.A.N.S. 717]), but I am equally aware of the necessity of permitting a liberal discretion on the part of the trial court in conducting the trial generally and in controlling the examination of witnesses. As pointed out earlier in this dissent, the defendants are not on trial before this court. An appellate court should not, and as a practical matter cannot, re-try every case on appeal. Many of the specifications of error made by appellants in regard to the cross-examination of McKnight are without merit. For example, he was asked on cross-examination if two men had not approached him at his home and asked him if he would give a statement which would help convict the defendants, and he replied that he had been so approached. Questions along this line were objected to as hearsay and not connected in any way with the case. The men referred to were not identified in any way nor were they shown to be connected with the district attorney's office. The objection was properly sustained. (See *People* v. *Achal,* 125 Cal.App. 652 [14 P.2d 773].) McKnight's contact with the district attorney's office was fully brought out in other portions of the testimony. The defense witness C. G. Anthony, vice-

president of Pacific Freight Lines, was questioned on direct examination concerning the conduct of a picket line in front of the freight line offices. On cross-examination this witness testified that he saw men with wounds, these men being employees who had not gone out on strike; that one of his men had received a severe beating; that during the strike a rifle bullet had been fired into one of the company's gasoline tankers on the Ridge Route; and that a truck was turned over and windshields were broken. The questions calling for the above testimony were all objected to as going beyond the scope of direct examination and as being hearsay. The overruling of such objections was obviously not error. All that was testified to took place during the time the picket line was on, and Anthony was testifying as to facts within his own knowledge. The defendants were being tried on charges of assaults, extortion and conspiracy to commit those offenses. Lewis testified that he was in charge of this strike and picket line. There can be no question that the testimony was relevant.

No further reference need be made to specific testimony or the introduction or asserted suppression of evidence generally. Some error may have been committed by the trial court, but in view of the discretion that must be placed in the hands of the trial court in controlling the examination of witnesses and the introduction of evidence, particularly in cases in which the crime of conspiracy is charged, I am convinced that no prejudicial error has resulted.

The appeal of appellant Dail should be dismissed, and the judgments and orders denying new trials as to the other appellants should be affirmed.

Shenk, J., concurred.