Filed 6/12/13 (unmodified opinion and publication order attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ZANG HER,<br><br>        Defendant and Appellant. | C069153<br><br>(Super. Ct. No. 09F00826)<br><br>ORDER MODIFYING OPINION<br><br>CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on May 14, 2013, and subsequently ordered filed for partial publication on May 29, 2013, be modified as follows:

On page 2, after the words "we affirm" in the last sentence of the first full paragraph, insert the following footnote, which will require renumbering of all subsequent footnotes:

Defendant died in December 2012. Defendant's death during the pendency of the appeal abates all further proceedings in the case. (*People v. Dail* (1943) 22 Cal.2d 642, 659.) However, we exercise our inherent authority to retain the appeal for issuance of this opinion since it raises important issues of public interest that are likely to recur in other cases. (See, *e.g.*, *People v. Nottoli* (2011) 199 Cal.App.4th 531, 535, fn. 3.)

1

On page 15, delete the Disposition and insert the following Disposition in its place:

As noted at the beginning of our opinion, defendant has died, and his death abates all further proceedings in the case. (*People v. Dail*, *supra*, 22 Cal.2d at p. 659.) We therefore remand the case to the trial court with directions to enter an order that all proceedings in the case have permanently abated. (See *In re Jackson* (1985) 39 Cal.3d 464, 480.)

BY THE COURT:

_____ROBIE_____, Acting P. J.

_____MAURO_____, J.

2

Filed 5/14/13  Certified for partial publication 5/29/13 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C069153 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F00826) |
| v. | |
| ZANG HER, | |
| Defendant and Appellant. | |

John Lone Eagle was found strangled to death with a telephone cord in his Carmichael bedroom.  About $4,000 was missing from his bedroom.  DNA consistent with the genetic profile of defendant Zang Her was found in three places in the house -- on a latex glove that was tangled in the telephone cord around John Lone Eagle's neck, on a pillow in the same bedroom, and in a blood spot on the entryway floor to the house. Defendant was also linked to John Lone Eagle through defendant's wife and an acquaintance.  A jury found defendant guilty of first degree burglary and first degree murder with the special circumstance that the murder was committed during a burglary. The jury did not reach a verdict on whether defendant personally used a weapon (the telephone cord).

1

Defendant appeals from the resulting prison sentence of life without the possibility of parole, raising three issues relating to the evidence and the jury's composition. Finding no merit in these contentions, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A

*The Prosecution's Case*

John Lone Eagle operated a business out of his home in which he bought and sold foreclosed homes. He employed four or five women to help him, and he transacted a lot of business in cash, which he kept in the house, oftentimes in plain view.

In the summer of 2004 when he was murdered, John Lone Eagle was in poor health and was not very mobile. One August morning, an employee arrived at his house to start work. The door was unlocked and the house had been ransacked. She went into his bedroom and saw him on the bed with a pillow over his head. When she shook him and he was unresponsive, she noticed there was blood all over his pillow and shirt. She called 911.

Police arrived and pronounced John Lone Eagle dead. He had been strangled with a telephone cord that was still around his neck.

Forensics testing by criminalists Kristie Abbott and Jeffrey Herbert was conducted on the pillow, the glove, and blood stains found on the ground in the entryway to the house, on the wall behind the front door, and on the wall of the stairwell.

As to three blood stains on the pillowcase, they contained a mixture of DNA from two contributors. In one of those samples (DNA 5), the major contributor had a DNA profile that "was the same" (meaning the profile matched defendant's at all 15 designated loci on the genome) as the reference profile of defendant's, and the minor contributor had a DNA profile that matched John Lone Eagle's. In the Asian population, the chance of a random person having a DNA profile matching defendant's was 1 in 150 quintillion. The two mixed-source samples (DNA 7 and DNA 9) on the pillowcase contained John Lone

2

Eagle's DNA profile and alleles from a minor contributor at "two and four" of the 15 loci. "The partial profile for the minor contributor to each mixture is consistent with the profile of the major contributor to DNA 5."

As to the glove, it contained defendant's DNA on the inside of three fingers that also contained John Lone Eagle's DNA. Defendant's and John Lone Eagle's DNA were also detected in a mixture on two other spots on the glove, which also contained an "additional allele" that indicated there was a third contributor.

As to the blood stain found in the entryway on the ground, it contained about an even mixture of defendant's and John Lone Eagle's DNA profiles, as measured by a formula known as the combined probability of inclusion. The chances that a random person in the Hispanic population could have been a contributor to the sample were 1 in 140 million. In the African American and Caucasian populations, it would have been even rarer. When using this formula, criminalist Herbert assumed the entryway blood sample contained DNA from only two people, both males, and there was no allelic dropout. Had he not made those assumptions, the numbers would have been "more common."

As to the blood stain on the wall in the stairwell, it contained DNA from only one person -- John Lone Eagle.

As to the blood stain on the wall behind the front door, it contained DNA from an unknown male.

Besides being linked to John Lone Eagle through DNA, defendant was linked to John Lone Eagle through defendant's wife and through an acquaintance named Derek Wong. About two months after the murder, police found a piece of paper in Wong's house that contained John Lone Eagle's address. In a recorded phone call between defendant and his wife, defendant admitted being introduced to Wong by his wife.

3

B

*The Defense*

Defendant worked for a paint store at the time of the murder. As part of his job, defendant often had to wear latex gloves that were similar to the one found at the crime scene. Based on this evidence, defense counsel argued that defendant's discarded work gloves were used by the real killer when he murdered John Lone Eagle.

DISCUSSION

I

*The Trial Court Was Within Its Discretion To Admit Partial*

*DNA Profile Evidence Without Accompanying Statistical Analysis*

Defendant contends the trial court erred in allowing the People to admit testimony that a partial DNA profile in two mixed-source samples on John Lone Eagle's pillowcase was consistent with defendant's genetic profile. He argues that because the testimony about those samples was not accompanied by any statistical analysis, it had no probative value. As we will explain, defendant is wrong.

In California, only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id*., § 210.) An appellate court reviews a trial court's evidentiary rulings for abuse of discretion. (*People v. Venegas* (1998) 18 Cal.4th 47, 93.) Here, the trial court ruled that the People's expert could testify the partial DNA profile detected in both mixed-source samples was consistent with defendant's DNA because it was relevant circumstantial evidence of the perpetrator's identity in the context of other DNA evidence. This ruling was well within the court's discretion.

One of the People's DNA experts, Kristie Abbott, testified only that the alleles in the partial profiles were "consistent" (as opposed to being a "match") with defendant's DNA profile, meaning he could not be excluded as a possible contributor. The

prosecutor in closing argument used the same nomenclature when arguing that the alleles in the partial profile were "consistent" with defendant.[1]

This evidence and argument was consistent with case law -- both in California and beyond -- that DNA testimony need not be accompanied by statistical analysis. In California, Division Five of the First Appellate District upheld admission of testimony that DNA evidence at the scene " 'belonged to' " the defendant, where the People did not provide statistical support for that conclusion. (*People v. Cua* (2011) 191 Cal.App.4th 582, 596, 597, 600.) Other state courts have ruled in cases similar to the one here that evidence of a partial DNA profile consistent with the defendant's profile is relevant and admissible absent statistical analysis. The Nevada Supreme Court explained it this way: "DNA nonexclusion evidence is admissible in the absence of supporting statistical data reflecting the percentage of the population that could be excluded as long as the nonexclusion evidence is relevant, because any danger of unfair prejudice or of misleading the jury is substantially outweighed by the defendant's ability to cross-examine or offer expert witness evidence as to probative value." (*Rodriguez v. State* (2012) 273 P.3d 845, 851.) A Missouri appellate court ruled as follows in response to a defendant's contention that, without that statistical analysis, the conclusions of the People's DNA experts were irrelevant and, therefore, inadmissible: "Even though a full genetic profile was not obtained, the circuit court could rely on the partial profiles that left [the defendant] as a possible source of the DNA along with the other evidence in determining guilt. 'The weight to be afforded this evidence was within the province of the [fact-finder] to decide.' " (*State v. Harding* (2010) 323 S.W.3d 810, 817-818.)

---

[1]     Defendant argues the prosecutor took the argument too far by arguing, "You are also seeing, at least at an extremely low level, alleles that are consistent with defendant but no other person." Contrary to defendant's suggestion, the phrase "no other person" referred not to the entire population, but to John Lone Eagle and to other people whose DNA was tested as part of the investigation in this case.

The rationale of these cases applies here.   The evidence of the two partial profiles was relevant because they were consistent with the profile of the major contributor of the other blood stains on the pillow and therefore had a tendency in reason to show that defendant murdered John Lone Eagle.   Specifically, Abbott testified the three blood stains on the pillowcase contained a mixture of DNA from two contributors.  In one of those samples (DNA 5), the major contributor had a DNA profile that "was the same" as the reference profile of defendant's, and the minor contributor had a DNA profile that matched John Lone Eagle's.  In the Asian population, the chance of a random person having a DNA profile matching defendant's was 1 in 150 quintillion.  Abbott further testified the two mixed-source samples (DNA 7 and DNA 9) contained the victim's DNA profile and alleles from a minor contributor at "two and four" of the 15 loci.  "The partial profile for the minor contributor to each mixture is consistent with the profile of the major contributor to DNA 5."  Thus, because the partial profile was consistent with the profile of the major contributor to the other blood stains on the pillow, which bore defendant's profile, it was relevant to support the People's theory that defendant killed John Lone Eagle.  The court did not abuse its discretion in admitting the evidence.

II

*The Trial Court Did Not Violate Defendant's Constitutional Rights When It Placed Certain Restrictions On The Cross-Examination Of The People's DNA Experts*

Defendant contends the trial court violated his federal constitutional rights by limiting his cross-examining of Jeffrey Herbert about criticism of Herbert's statistical methods in a prior case and of Kristie Abbott about shortcomings at the Sacramento County crime laboratory (the crime lab) that were unrelated to the work in this case.  As we explain, there was no error.

6

A

*Factual Background*

Defendant filed a motion requesting he be allowed to impeach Herbert with evidence of the following: Herbert's method of calculating probability statistics was criticized in a prior case, *People v. Smith* (06F00122); Herbert incorrectly testified in *Smith* the chance of a random person other than the defendant being a contributor to a mixed-source DNA sample was 1 in 95,000 when it was really 1 in 13; lack of understanding of statistical analysis of mixed-source samples led to the crime lab's removing him from his position analyzing DNA evidence; Herbert concealed criticisms of his work (i.e., he falsely testified in *Smith* that his work was approved following an administrative review); and he failed a competency exam at the crime lab. Defendant also requested he be allowed to introduce evidence that audits of the crime lab in 2005 and 2010 uncovered deficiencies that led to delayed reaccreditation. Specifically, there were insufficient studies of the crime lab's internal validation of DNA testing methods; there was insufficient chain of custody for evidence; there were problems with the scope of authorization for DNA analysts; the entrance to the biology unit was not secured; and there were deficient protocols for reducing DNA contamination.

The prosecutor argued that the criticisms of Herbert in *Smith* were mostly irrelevant because in *Smith*, unlike here, it was improper to assume there were only two donors to the mixed-source sample and there were strong indications of "allelic drop out" (meaning the sample level was very low so one could not see the complete DNA profile). Thus, while Herbert's use of the combined probability of inclusion method was arguably inappropriate in *Smith*, it was not inappropriate here. Explaining to the jury why the two cases were different would be an undue consumption of time, "basically a trial within a trial to flesh out these issues." If the defense wanted to elicit that there were "dings" on Herbert's record, defense counsel could do that in a few, very focused questions on cross-

examination.  Finally, the testimony in *Smith* did not show Herbert had lied or misled the jury when he stood by his random match calculation of 1 in 95,000.

The trial court ruled defense counsel could question Herbert about the appropriateness of using the combined probability of inclusion method in this case and about errors in using that method in *Smith* and whether he received "some outside criticism," but it would not permit a "full-blown inquiry" into *Smith* because it would be "enormously time consuming . . . [and] illuminating of . . . virtually nothing."  Defense counsel could not ask Herbert questions suggesting he lied in his testimony in *Smith* because the transcripts did not support that he did.  Defense counsel could ask Herbert whether he failed the competency exam, but the prosecutor could then elicit that thereafter he passed it.  Defense counsel could ask whether Herbert's DNA case work had been restricted, but counsel could not elicit the details.  As for delays in the accreditation of the crime lab, the court ruled defense counsel could ask Abbott and Herbert about those only if the shortcomings cited in the audits had a direct bearing on the DNA analysis in this case.

At trial, defense counsel briefly cross-examined Herbert.  Defense counsel did not ask Herbert if he made any mistakes in another case that resulted in outside criticism.  He did not ask whether Herbert had failed a competency exam and whether there were limitations placed on him participating in DNA cases.  At trial, during defense counsel's cross-examination of Abbott, he did not ask questions about whether the DNA analysis in this case could have been compromised by any of the shortcomings cited in the audits.

*The Court's Limitations On Questioning Herbert And Abbott*

*Did Not Violate Defendant's Constitutional Rights*

1.    *Precluding Defense Counsel From Cross-Examining Herbert Regarding Details Of The Smith Case*

Defendant contends the court violated his right to confrontation when it limited its cross-examination of Herbert about *details* of the *Smith* case.  As noted, the trial court ruled defense counsel could question Herbert about the appropriateness of using the combined probability of inclusion method in this case and about errors in using that method in *Smith* and whether he received "some outside criticism," but it would not permit a "full-blown inquiry" into *Smith* because it would be "enormously time consuming . . . [and] illuminating of . . . virtually nothing."  There was no violation of defendant's right to confront the witnesses against him with this ruling.

The key issue here regarding the validity of the random match probability statistics for the DNA sample in the entryway was whether the combined probability of inclusion method was appropriately applied for that sample -- not to a sample in another case.  As to the sample in this case, defense counsel was allowed to elicit testimony from Herbert that he assumed the entryway blood sample contained DNA from only two people, both males, and there was no allelic dropout.  Had he not made those assumptions, the numbers would have been "more common."  He was also allowed to elicit that alleles could be measured with confidence at only seven of the 13 loci.  Under the trial court's ruling, defense counsel was also permitted to elicit (although he did not) that Herbert's use of the combined probability of inclusion method under those circumstances was inappropriate.

Compared to this questioning, asking Herbert about mistakes he made in the *Smith* case using the combined probability of inclusion method would have been of little relevance while having the potential to confuse the issue and take up an undue amount of

time.  On this record, there was no violation of defendant's right to confront the witnesses against him by limiting this evidence.  (*Delaware v. Van Arsdall* (1986)  475 U.S. 673, 679 [89 L.Ed.2d 674, 683] [trial judges retain wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, confusion of the issues or interrogation that is only marginally relevant].)

Similarly, the trial court's ruling prohibiting defense counsel from questioning Herbert about his testimony in *Smith* did not violate defendant's right to confront the witnesses against him.  Contrary to defendant's position both at the trial court and on appeal, the transcript does not show Herbert gave "willfully false testimony" about criticism of the statistics he provided in *Smith*.  The transcript shows that Herbert acknowledged there was a "dispute" about the statistics he provided in *Smith* but that Herbert stood by his work, finding no errors and that his report was approved by his supervisor.  As the trial court correctly found, defense counsel could not ask Herbert questions suggesting he lied in his testimony in *Smith* because the transcripts did not support that he did.  As such, cross-examining him about this testimony in *Smith* would not have shed any negative light on Herbert's veracity.

2.      *Precluding Defense Counsel From Cross-Examining Herbert And Abbott Regarding Deficiencies In The Crime Lab*

Defendant contends the court violated his federal right to confront the witnesses against him when it precluded defense counsel from cross-examining Herbert and Abbott regarding deficiencies in the crime lab cited in two audit reports.  Defendant fails to acknowledge the court did give defense counsel the opportunity to introduce such evidence if counsel could establish the shortcomings cited in the audit had a direct bearing on the DNA analysis in this case.  Defense counsel made no attempt to do so in either cross-examination.  Absent that link, evidence about the shortcomings in the audits would not have had a tendency in reason to help the jury evaluate the reliability of test

10

results reported by Herbert and Abbott in this case. As such, the exclusion did not violate defendant's right to confrontation.

3. *No Violation Of Defendant's Due Process Rights*

In an argument related to the two above, defendant contends the court's limitations on his cross-examination of Herbert and Abbott also violated his due process right to present a defense and to have a fair trial.

Similar to the right to confrontation, a defendant's due process right to present a defense and have a fair trial apply only to "relevant and material" evidence that is of a significant probative value to the defense. (*Washington v. Texas* (1967) 388 U.S. 14, 23 [18 L.Ed.2d 1019,1025].) The exclusion of defense evidence on a minor or subsidiary point does not interfere with these rights. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 58.) As we have explained, although the trial court placed limits on defense counsel's cross-examination of Herbert and Abbott, defense counsel was still permitted to question them about all aspects of their DNA testing in this case, a little bit about the testing in *Smith*, and any aspect of the crime lab audits that had a bearing on the reliability of that testing. As we have explained, this was the relevant evidence. As the court allowed defendant to introduce this evidence, there was no violation of defendant's due process right to present a defense and to have a fair trial.

III

*The Trial Court Did Not Err In Dismissing Juror No. 12*

Defendant contends the trial court violated his right to a decision by a unanimous and impartial jury when it dismissed Juror No. 12. He argues the court's inquiry: (1) intruded into the jury's deliberative process; and (2) did not reveal grounds to dismiss the juror because she was merely applying the presumption of innocence.

As we will explain, defendant's first argument is forfeited and his second one lacks merit.

11

## A

### *Background Regarding The Dismissal Of Juror No. 12*

The day following the first day of deliberations, Juror No. 6 reported to the bailiff that Juror No. 12 "had decided on the first day of the trial how she was going to vote." "She also said she was going to vote strictly on her feelings . . . there was no point in talking about [the facts] with the rest of the jurors because she had already made up her mind on how she was going to vote."

After conferring with counsel, the court interviewed Juror No. 6, Juror No. 1 (the foreperson), Juror No. 7, and Juror No. 12. Thereafter, the court ruled Juror No. 12 had violated its instructions in several respects, "most significantly, by having reached her conclusion as to this case before the deliberative process even began." Accordingly, the court dismissed Juror No. 12, replaced her with an alternate, and instructed the jury to begin deliberations anew.

## B

### *Defendant Forfeited His Contention That The Court*
### *Conducted An Intrusive Inquiry Into The Jury Deliberations*

Defendant contends the court violated his constitutional rights to a fair trial and impartial jury by conducting an intrusive inquiry into deliberations. Specifically, he claims the court improperly asked Juror No. 12 about her thought process when it asked her questions about her "feelings" in the case. Defendant has forfeited this claim by failing to object to the method by which the court conducted its inquiry.

During the court's inquiry of Juror No. 12, defense counsel never objected to the manner in which the court was questioning her. After the court finished questioning Juror No. 12 and asked both attorneys for their thoughts, defense counsel argued only that the juror's response about her feelings was "really the very, very, very natural human process of approaching problems." When the court suggested that inquiring further with the other jurors might help determine whether Juror No. 12 was "willing to set that gut

12

feeling aside and listen to the evidence, apply that law and collegi[all]y deliberate with the other jurors," defense counsel said, "Right, that inquiry needs to be made; I agree."

Under these circumstances, where defense counsel did not object to the court's inquiry and even agreed to a similar further inquiry of the other jurors, defendant has forfeited his argument that the questioning of the juror was improper.  (*People v. Avila* (2009) 46 Cal.4th 680, 727-728 [defendant forfeited his contention that the trial court's questioning of a juror "was not 'even-handed,' and that the court 'did not adequately question jurors as to the actual statements made, while delving into the deliberative process' " because counsel agreed to the questioning and even suggested further questioning].)

## C

### *The Court Did Not Err In Dismissing Juror No. 12*

Defendant contends the court erred in dismissing Juror No. 12 because she was simply a holdout juror who was passionate and adamant about her opinion.  " 'We review for abuse of discretion the trial court's determination to discharge a juror and order an alternate to serve.  [Citation.]  If there is any substantial evidence supporting the trial court's ruling, we will uphold it.  [Citation.] . . .  [H]owever, . . . a juror's inability to perform as a juror " 'must appear in the record as a demonstrable reality.' "  [Citation.]' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 474.)   As we explain, there was no abuse of discretion here.  Juror No. 12's inability to perform as a juror was based on substantial evidence in the form of testimony from three other jurors and Juror No. 12's responses to the court's questioning.

There was substantial evidence Juror No. 12 had reached a conclusion about how the case should be decided even before the deliberative process began and then refused to deliberate.  Specifically, three jurors testified Juror No. 12 had made up her mind before deliberations began and refused to deliberate.  And Juror No. 12 partially confirmed their version of events.

13

Juror No. 6 testified that Juror No. 12 "had specified from day one she had decided how she felt about the case and . . . had known from the very first time when she walked in how she was going to vote." When other jurors "discussed with her that she was supposed to be basing her opinions on the facts of the case, she said she knew what the facts were and she was going with her feeling and she didn't care." When other jurors started expressing their opinions about the case, Juror No. 12 "was busy doing stuff in her binder and wasn't paying attention anymore, and every time somebody would talk to her she'd start yelling." She mentioned that she did not want to miss her vacation with her grandson and "didn't want this to take too long."

Juror No. 1 testified that Juror No. 12 had made up her mind from the first day she walked in. Juror No. 12 said she was basing her opinion on her "feelings" and "intuition" and "not facts." When other jurors tried to remind her she needed to work with the other jurors and discuss all their viewpoints, Juror No. 12's response was, "I don't care." She also mentioned her grandson was coming to town and "she doesn't have time to do this."

Juror No. 7 testified that Juror No. 12 "mentioned the first day, that she had already decided." "I've already made up my mind. Nothing anyone says will change my mind. . . . From the very beginning, I had decided."

Juror No. 12 somewhat corroborated the testimony of the other jurors when she testified that "when I came in . . . looking at the defendant and everything that was presented before me, there was a feeling before the process started." It was a "gut feeling" that made her "lean . . . toward a certain decision." She listened to the court's instructions about "leav[ing] feelings out of this" but she was "not a robot" and felt "feelings have to come into decision-making" -- those "innate, gut, intuitive feelings that I cannot just dismiss." She did mention that her grandson was going to be visiting and she "want[e]d the deliberation process to go faster than slower."

Based on these jurors' testimony, there was substantial evidence to support the trial court's determination that Juror No. 12 was unable to perform as a juror and

14

therefore no abuse of discretion in excusing her. (See *People v. Feagin* (1995) 34 Cal.App.4th 1427, 1436-1437 [where several jurors testified that the at-issue juror was unwilling to participate in the jury discussions, had refused to explain her thoughts, and had already made up her mind, the court found substantial evidence to support the finding the at-issue juror was unable to perform her functions as a juror as a demonstrable reality, and there was no abuse of discretion in excusing her].) Because we have concluded the trial court did not abuse its discretion in excusing Juror No. 12, her discharge did not violate defendant's constitutional rights. (*People v. Lomax* (2010) 49 Cal.4th 530, 591.)

DISPOSITION

The judgment is affirmed.


                                    ROBIE          , Acting P. J.



We concur:



        MAURO        , J.



        DUARTE       , J.


15

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C069153 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F00826) |
| v. | ORDER CERTIFYING |
| | OPINION FOR PARTIAL |
| ZANG HER, | PUBLICATION |
| Defendant and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on May 14, 2013, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports except for parts II and III of the Discussion, and it is so ordered.

BY THE COURT:

    ROBIE               , Acting P. J.

    MAURO              , J.

    DUARTE             , J.

_____

*     Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

EDITORIAL LISTING


APPEAL from a judgment of the Superior Court of Sacramento County, Steve White, Judge.  Affirmed.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Catherine Chatman and Daniel B. Bernstein, Deputies Attorney General, for Plaintiff and Respondent.