Filed 6/24/15  P. v. Hendrix CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SUMADI HENDRIX,<br><br>    Defendant and Appellant. | H040456<br>(Santa Clara County<br>Super. Ct. No. C1240409) |

Defendant Sumadi Hendrix was charged and convicted of assault with intent to commit rape (Pen. Code, § 220, subd. (a)).[1]  On appeal, defendant asserts instructional error and alternatively argues that, if this court considers his contention forfeited, defense counsel provided ineffective assistance by failing to object to the challenged instruction.

We find no reversible error.

I

*Facts*

On January 21, 2012, Margaret Doe was living in a San Jose apartment.  Margaret drove home alone that night and, at about 11:30 p.m., she parked on the street, which ended in a cul-de-sac.  She was wearing a loose pullover sweatshirt.  It was "really dark."  She collected her things, got out of the car and closed the door, and discovered defendant standing two to three feet away from her, which shocked her.  He had a pit bull puppy on

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

a leash with him. Margaret had seen defendant walking his dog around the neighborhood before but had never had a conversation with him.

Defendant twice asked Margaret whether she wanted to go on a walk with him. She said no both times; she was feeling nervous and anxious. Margaret began to walk toward her apartment, which was about 20 feet away. For about "a good ten feet," defendant walked alongside her at the same pace. At this point, she was terrified. Margaret walked past her apartment and continued walking straight instead of turning toward her apartment because defendant was in between her and her apartment.

At some point, defendant moved in front of Margaret and "bear-hugged" her. He grabbed Margaret around her shoulders with both of his arms; her arms were down by her sides. Defendant then put one arm around her waist and, with his other hand, touched her back, breasts, stomach, legs, and her buttocks over her sweatshirt or jeans. He groped her breasts for approximately five seconds and squeezed her buttocks with his whole hand. Margaret tried to resist by pushing against defendant's chest with her forearms. She was scared and she did not want to anger him because she was afraid he would hit her.

Margaret said that her roommate was coming and she had to go. Defendant asked her whether she had ever had sex with a black man before. She said no. Defendant queried whether he could be her first. He asked her to have sex with him. She said that she did not want to. His hand was continually around her waist. Margaret was not giggling, smiling, or flirting with him. Defendant indicated that sex would happen only one time because he did not want his girlfriend to find out. He specifically told her that he did not want her telephone number. Defendant said that his girlfriend and he had a baby together and defendant and Margaret "would have to keep it a secret or else it would ruin his life." Defendant said something like, "After we're done here, you're not going to tell my girlfriend."

Defendant asked Margaret if she was "good at giving head" and whether she "would give it to him." Margaret said that "he should have his girlfriend do that for him." She did not agree to give him oral sex.

Defendant held Margaret's wrist and tried to put her hand down his pants. She kept resisting and was able to pull her hand back.

During this period of touching, Margaret had repeatedly stepped back from defendant, who followed. At some point, Margaret realized that they had backed up to the curb next to the wall of the freeway. She was concerned because there was no light there and there were bushes. No one else was out on the street. Margaret was feeling terrified. Defendant put his hand in the pockets of Margaret's jeans and tried to pull down her pants. She "tried to grab the belt loops and pull them back up." Defendant told Margaret that he was stronger than she. She understood that statement to mean that if she fought him or made a scene, she could not stop him. Margaret did not scream because she thought that he might hit her or grab her mouth and "that would be it." Defendant began kissing her neck and she tried to pull away. He tried to open her mouth with his fingers. He told her that she would like this and she wanted it. She tried to tell him that she did not want it or like it but that did not stop defendant.

One car pulled up and did a quick U-turn but that did not stop defendant. A few minutes later, a second car came down the street, stopped, and double parked with its lights on. When the second car illuminated the area where they were, defendant let Margaret go and stepped back. Margaret ran fast to her car, got inside, and drove to her cousin Johnny's house, which was not far. She was crying, upset, and shaking. Margaret's interaction with defendant had lasted between 10 to 15 minutes.

Margaret told her cousin what had happened. She did not call the police; she did not think there was anything anyone could do because she was not raped and she was not hit. She was there approximately 45 minutes. Margaret's cousin told her to go to her sister and her sister would advise her. Margaret's sister received a call from Margaret,

3

who was "really, really upset" and crying. Margaret drove to her sister's home and told her sister that a black man had tried to rape her. Margaret's sister called their mother and they convinced Margaret to call police. Margaret's sister telephoned 9-1-1 for her and Margaret spoke with the operator.

At about 3:45 p.m. on January 22, 2012, San Jose Police Officer Angelo Delossantos responded to a call of attempted rape. The officer went to the home of Margaret's sister and spoke with Margaret, who was very scared. Officer Delossantos collected a DNA sample from Margaret's neck using a swab.

On April 27, 2012, Margaret subsequently selected a photograph of defendant from a six-photograph lineup.

On August 2, 2012, while Margaret was working at Jamba Juice in Willow Glen, defendant came into the store with a female and a baby. She recognized him and they looked at each other and froze. She was scared and went into the back of the store, where she watched the store's cameras. Defendant remained in the store for some time. She called the detective assigned to the case. On August 2, 2012, San Jose Police Officer Tina Latendresse received a telephone call from Margaret, who "sounded panicked, frantic, [and] scared . . . ."

On September 10, 2012, Officer Latendresse collected DNA samples from defendant's cheeks using buccal swabs.

Heather Parsons, a criminologist at the Santa Clara County Crime Laboratory, testified as an expert at trial. She analyzed the swabs from the victim's neck. The criminologist determined that the DNA sample was a mixture of a female and male DNA. The major component was female and the minor component was male. It was determined that the victim was the source of the female DNA.

Teresa Shab, another criminologist at the Santa Clara County Crime Laboratory who also testified as an expert at trial, conducted DNA testing on the buccal swab of defendant's left cheek and generated a reference DNA profile. She compared the

4

reference sample to the DNA from the victim's neck swab. Criminologist Shab determined that the likelihood of obtaining that DNA mixture from the neck swab was greater if Margaret and defendant were the contributors than if Margaret and an unknown individual were the contributors by a factor of 520 million to one in the United States African-American population, 16 trillion to one in the United States Caucasian population, and 2.3 trillion to one in the United States Hispanic population. In her opinion, the evidence was "extremely strong" that Margaret and defendant were the contributors.

II

*Discussion*

1. *Background*

Defendant contends that the court committed reversible instructional error by giving contradictory instructions on motive and intent.

The trial court instructed in part: "The crime charged in count 1, assault with intent to commit a felony . . . require[s] proof of the union or joint operation of act and wrongful intent. [¶] The crime of assault with intent to commit rape requires a specific intent. For you to find a person guilty of this crime that person must not only intentionally commit the prohibited act but must do so with a specific intent."

With respect to motive, the trial court instructed: "The People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict, you may however consider whether the defendant had a motive. Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

As to the elements of assault with intent to commit rape, the trial court told the jury: "Now I will cover the elements. The defendant is charged in count 1 with assault with intent to commit rape in violation of Penal Code section 220(a). To prove the defendant is guilty of this crime, the People must prove one, the defendant did an act that

5

by its nature would directly and probably result in the application of force to a person. [¶] Two, the defendant did the act willfully. Three, when the defendant acted he was aware of the facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone. [¶] Four, when the defendant acted, he had the present ability to apply force to a person. And five, *when the defendant acted he intended to commit rape.* Someone commits an act willfully when he does it willingly or on purpose." (Italics added.)

The trial court further explained to the jury: "The terms 'application of force' and 'applied force' means to touch in a harmful or offensive manner. [¶] The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person including through his or her clothing is enough. The touching does not have to cause pain or injury of any kind."

2. *No Forfeiture of Claim of Error*

The People first argue that defendant forfeited his claims because "he neither objected to the [motive] instruction nor proposed additional clarifying language." They rely upon the following principle: "A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial. (E.g., *People v. Hart* (1999) 20 Cal.4th 546, 622.)" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503 (*Hillhouse*).) Defendant is not arguing, however, that the motive instruction was too general or incomplete.

Instead, defendant maintains that the motive instruction contradicted the specific intent instructions and, therefore, the trial court erred in giving the motive instruction. "Inconsistent instructions have frequently been held to constitute reversible error where it was impossible to tell which of the conflicting rules was followed by the jury. [Citations.]" (*People v. Dail* (1943) 22 Cal.2d 642, 653.)

Under section 1259, "[t]he appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the

substantial rights of the defendant were affected thereby." Thus, regardless of defendant's failure to object to the motive instruction, this court may review his claim of instructional error to the extent substantial rights were affected. (See *People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) If defendant is correct in asserting that contradictory instructions likely misled the jury to believe that the People did not need to prove that he had the specific intent to commit rape when he committed the assault, the alleged error would have affected his substantial rights. (See *People v. Johnson* (2015) 60 Cal.4th 966, 993.) Accordingly, defendant claim of instructional error was not forfeited.[2] (See *Hillhouse*, *supra*, 27 Cal.4th at p. 503.)

3. *Analysis*

Defendant argues with regard to the meaning of "intent" and "motive" that "to a lay person, the two terms are often indistinguishable." He maintains that the motive and intent instructions were contradictory "because 'motive' and 'intent' are fungible terms, at least in the public imagination, and because the jury was told in effect that it need not consider whether [he] had a motive to also commit a rape when he committed the assault . . . ." He asserts that "while courts may recognize the legal distinction between 'intent' and 'motive,' a typical juror is not likely to." Defendant contends that "the instructions were confusing enough so that the jurors probably concluded that there was no specific intent requirement." He "submits that the instructional error denied him the right to due process and the right to a jury trial under the federal constitution. [Citations.]"

In *Hillhouse*, *supra*, 27 Cal.4th 469, the California Supreme Court made clear that the words "motive" and "intent" are separate and distinct mental states and they are not

---

**2** Since we find that defendant did not forfeit his claim of instructional error, we do not reach defendant's alternative argument that his trial counsel's failure to object to the motive instruction constituted ineffective assistance of counsel.

synonyms. (*Id*. at p. 504.) "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*Ibid*.) In *Hillhouse*, the defendant had argued that "telling the jury that motive is not an element of the crimes contradicted the other instructions, because motive [was] an element of the various crimes." (*Id*. at p. 503.) The Supreme Court concluded that "although malice and certain intents and purposes [were] elements of the crimes . . . , motive [was] not an element." (*Id*. at pp. 503-504.)

Defendant in this case contends that *Hillhouse* is distinguishable because in *Hillhouse* the jury was explicitly instructed in accordance with CALJIC No. 2.51 that " '[m]otive is not an element of the crime charged and need not be shown.' " (*Hillhouse*, *supra*, 27 Cal.4th at p. 503.) He also asserts that, since the jurors in this case were not instructed that motive was *not* an element of the charged crime, we cannot assume that they would "not be confused by instructions that tell [them] that motive is not an issue, but that intent is."

"It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record. [Citation]" (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.) "In reviewing a claim of instructional error, the ultimate question is whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' [Citation.] '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220.)

"In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. See *Sandstrom v. Montana*, 442 U.S. 510, 520-521 (1979). Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." (*Middleton v. McNeil* (2004) 541 U.S. 433, 437.) "If the charge as a

8

whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citation.]" (*Ibid*.)

Here, the trial court expressly laid out the five elements of the charged assault offense, including element five, the intent to commit rape. It explicitly told the jury that the People were *not required to prove* that the defendant had a motive to commit any of the crimes charged. Thus, the court implicitly instructed that motive was not an element of the charged assault with intent to commit rape. " 'Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 390.) In this case, "the instructions as a whole did not use the terms 'motive' and 'intent' interchangeably, and therefore there is no reasonable likelihood the jury understood those terms to be synonymous. (*People v. Seaton* (2001) 26 Cal.4th 598, 687.)" (*People v. Cash* (2002) 28 Cal.4th 703, 739.)

Moreover, the assumption that counsel's arguments clarified an ambiguous jury charge is " 'particularly apt when it is the *prosecutor*'s argument that resolves an ambiguity in favor of the *defendant*.' [Citation.]" (*People v. Mills* (2012) 55 Cal.4th 663, 680.) In closing argument, the prosecutor repeatedly acknowledged that, for the jury to find defendant guilty of assault with intent to commit rape, he had to prove five elements, including defendant's intent to commit rape. He specifically stated: "When the defendant acted, he intended to commit rape. Again, this has been gone over many, many times in this trial. I need not prove to you that the defendant committed rape. I do not have to prove to you putting it in very, very crass terms, that a penis entered a vagina. [¶] That is not what defendant is charged with. Simply that at the time he committed this assault, that was his intent."

We conclude that, in contrast to *People v. Dail*, *supra*, 22 Cal.2d 653, one of the cases relied upon by defendant, "the jurors were not misled by the giving of one

9

erroneous and one correct instruction covering the same subject." (*People v. Davenport* (1985) 41 Cal.3d 247, 272.) Viewing the record as a whole, and considering the instructions in context, there is no reasonable likelihood that the motive instruction misled the jury or caused it to apply the instruction in a way that violated the U.S. Constitution.

## DISPOSITION

The judgment is affirmed.

_____
ELIA, J.

WE CONCUR:


_____
RUSHING, P. J.



_____
PREMO, J.